Filed 2/24/14  Kell v. Autozone, Inc. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| TRAVIS KELL, | C064839 |
| Plaintiff and Respondent, | (Super. Ct. No. 07AS04375) |
| v. | **ORDER MODIFYING OPINION** |
| AUTOZONE, INC., | |
| Defendant and Appellant. | **[NO CHANGE IN JUDGMENT]** |

THE COURT:

It is ordered that the opinion filed herein on February 10, 2014, be modified as follows:

1.       On page 38, in the fifth line of the first full paragraph following the heading "2. The Effect of other Jury Instructions," insert a space between "No." and "12.26."

2.       In the first line of page 45, insert the word "the" between "statute," and "defendants" so that the phrase reads:

1

"failure to instruct on the immunity statute, the defendants were unable to argue that they."

3.      On page 50, in the second sentence following the heading "B.  Analysis," replace the word "Kell" at the start of the sentence with "AutoZone" so that the sentence reads:

AutoZone argues the people who made the decision to fire Kell -- AutoZoner relations -- were unaware of his protected activity, his June 2, 2005 complaint to Saucier.

4.      On page 58, in the fifth sentence of the first paragraph, remove the closing quotation mark before the phrase ""Q & A going" so that the sentence reads:

Kulbacki testified that White told him there was a "Q & A going" and said it did not look good for Kell.

5.      On page 58, in the sixth sentence of the first paragraph, replace the word "Kublacki" with the word "Kulbacki," so that the sentence reads:

At Zarate's store, Zarate overheard Kulbacki and White talking about Kell taking medication.

6.      On page 65, in the first sentence following the heading "Disparity between Actual Harm and Punitive Damages," replace the "em dash" with two dashes so that the sentence reads:

"California published opinions on this issue have adopted a broad range of permissible ratios--from as low as one to one to as high as 16 to one--depending on the specific facts of each case."

There is no change in the judgment.

BY THE COURT:

_____NICHOLSON_____, Acting P. J.

_____BUTZ_____, J.

_____MURRAY_____, J.

Filed 2/10/14  Kell v. AutoZone CA3 (unmodified version)

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| TRAVIS KELL, | C064839 |
| Plaintiff and Respondent, | (Super. Ct. No. 07AS04375) |
| v. | |
| AUTOZONE, INC., | |
| Defendant and Appellant. | |

A jury awarded plaintiff, Travis Kell, compensatory and punitive damages against his former employer, defendant AutoZone, Inc., finding AutoZone (1) terminated Kell's employment in retaliation for his complaining about harassment and retaliation (Gov. Code, § 12940, subd. (h))[1], and (2) failed to prevent harassment and retaliation (§ 12940, subd. (k)) under the California Fair Employment and Housing Act (FEHA, § 12900 et

---

[1] Undesignated statutory references are to the Government Code.

1

seq.).  The jury rejected Kell's claim of disability harassment.  AutoZone appeals from the judgment and the postjudgment order denying defendant's motion for judgment notwithstanding the verdict (JNOV) or a new trial.[2]  AutoZone initially contended (1) there was insufficient evidence that Kell's protected activity was "a motivating reason" for his termination; (2) there was insufficient evidence of oppression, fraud or malice to support punitive damages; and (3) the amount of punitive damages was unconstitutionally excessive.

While this appeal was pending, the California Supreme Court in *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203 (*Harris*), articulated a heightened burden of proof for FEHA cases.  The court held that a plaintiff seeking money damages for employment discrimination under FEHA must prove the illegal criterion was "a *substantial factor* motivating*" the employer's decision.  (*Harris*, *supra*, at p. 229.)  Just before oral argument, AutoZone submitted a letter to this court citing *Harris*, but at oral argument neither party mentioned *Harris*, despite our invitation to do so.  After oral argument, we requested and received supplemental briefing as to the effect, if any, of *Harris* and its progeny, specifically *Alamo v. Practice Management Information Corp.* (2013) 219 Cal.App.4th 466 (*Alamo*).

We conclude *Harris*'s heightened standard applies to this retaliation case, but the absence of a jury instruction requiring a "*substantial* factor motivating" AutoZone's decision did not result in a miscarriage of justice and therefore does not require reversal.  (Cal. Const., art. VI, § 13; Code Civ. Proc., § 475.)  We conclude AutoZone's original

---

[2]  Another defendant, AutoZone Regional Manager Jim Kulbacki, is not a party to this appeal.  The complaint alleged retaliation against both AutoZone and Kulbacki, but nonmanagement individuals are not personally liable for their role in retaliation. (*Jones v. Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, 1173-1174 (*Jones*).)  Judgment was entered against AutoZone only, and the notice of appeal was filed by AutoZone only.

2

contentions lack merit, except as to the amount of punitive damages. We reduce the amount of punitive damages, but otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In September 2007, Kell filed a complaint against AutoZone and his supervisor, Jim Kulbacki, alleging: (1) disability discrimination, (2) disability harassment, (3) failure to prevent discrimination and harassment (§ 12940, subd. (k)),[3] (4) failure to engage in an interactive process to discuss accommodation of Kell's disability, (5) failure to accommodate Kell's disability, (6) retaliation (§ 12940, subd. (h)), and (7) wrongful termination in violation of public policy. Before trial, Kell dismissed four counts and proceeded to trial on three claims: (1) disability harassment, (2) retaliation, and (3) failure to prevent harassment and retaliation.

### Trial Evidence

Kell began working for AutoZone as a part sales manager in March 1996 and was a district manager when he was fired in November 2005. That Kell performed well over the course of his employment over nine and a half years is not disputed by AutoZone. Rather, AutoZone claims it terminated Kell for "falsifying" a store audit.

During the relevant timeframes here, Kell's supervisor was Jim Kulbacki, AutoZone's Sacramento regional manager. Kulbacki's supervisor was Rick Smith, vice-president of operations for the western division. Stacy Saucier was the divisional human resources (HR) manager. The regional HR manager was Nicole McCollum. McCollum reported to Kulbacki.

---

[3] Section 12940, subdivision (k), which makes it unlawful for an employer to fail to take reasonable steps to prevent discrimination and harassment, applies to failure to prevent retaliation. (See *Taylor v. City of Los Angeles Dept. of Water & Power* (2006) 144 Cal.App.4th 1216, 1239-1240, disapproved on another ground in *Jones, supra,* 42 Cal.4th at pp. 1173-1174.) The jury was so instructed.

In February 2004, Kell was diagnosed with "bipolar condition" and went on medical leave for six weeks. Kell testified that when he returned to work, coworkers at AutoZone's regional office were standoffish. One fellow district manager asked him how he was doing and said, "I heard you went crazy."

Another district manager, Michaele "Alonzo" Lombardi, testified he heard people at the regional office make fun of Kell's mental disability. Some of these comments were made under their breath within earshot of Lombardi at conference tables during meetings at the regional office.

Lombardi heard McCollum -- who no longer works for AutoZone and who did not testify -- make comments about Kell almost every time Lombardi was in the regional office. Lombardi visited the regional office approximately once a week. McCollum referred to Kell as "retarded" behind his back. Lombardi testified that McCollum "discussed in front of" him and several other regional staff that Kell was claiming he was "bipolar and schizophrenic," needed to take medication and was asking for a leave. McCollum said she thought Kell was "faking it" and asked Lombardi and others to monitor Kell to see if he actually had a problem. Lombardi testified that he complained to McCollum about her comments, but she replied that she was an HR manager, had extensive background and she knew what she was doing. Based on McCollum's responses, Lombardi became uncomfortable with her.

Thereafter, Lombardi had a conversation with Kell's direct supervisor, regional manager Kulbacki, in which Lombardi informed Kulbacki that Kell "was having a rough time." He further told Kulbacki that Kell "needs to be talked to by you, and he's got some concerns and you might want to consider it." Kulbacki said he would look into it.

Kell testified Kulbacki also made comments about Kell's mental health. For example, Kulbacki asked Kell if he was taking his medications and told Kell he seemed "loopy." Another district manager, Randy Crosby, testified that Kulbacki, referring to

4

Kell, said it was "stupid for somebody to go on a leave of absence for stress." Kulbacki denied making such comments.

After returning from medical leave, Kell for the first time was rated "needs improvement" on his performance evaluations in March and October of 2004. After the October 2004 evaluation, Kulbacki and McCollum met with Kell. Kell thought the evaluation was unfair because it included time he was on leave, and he thought it related to his disability. He expressed this concern to Kulbacki during the meeting. McCollum responded, "You don't have a disability or handicap, you're taking medication." Kulbacki denied that Kell expressed this concern and that McCollum made that response.

From May 31 to June 2, 2005, Kell attended AutoZone's training conference in Ontario, California. Kell testified that, on the first day of the conference, after speaking with Saucier about his 360 evaluation, he told her he planned to talk to her about complaints he had of unprofessional conduct and harassment by Kulbacki and McCollum, as well as complaints made by three of his store managers, Bobbie Standridge, Mario Zarate, and Tasha Trease. He did not give Saucier the details at that time.

On the second day of the conference, a meeting of district managers with an outside employment law consultant was held. According to Kell, senior management personnel were excluded. During this meeting, Kell asked a "hypothetical" question about a regional manager making comments to an employee about medication and an HR manager referring to employees as "retards." The outside consultant said to report the issues to HR.

On June 2, 2005, at the end of the training conference, Kell and Lombardi waited outside Divisional HR Manager Staci Saucier's office to report harassment and discrimination complaints. Both Kell and Lombardi testified that as they waited, Rick Smith, vice-president of operations for the western division and Kulbacki's supervisor,

5

went to Saucier's office door and told her that he (Smith) needed to hear everything Kell and Lombardi had to say.

Lombardi testified he went into Saucier's office first and told her that McCollum and others were making fun of Kell, calling Kell a "tard wrangler," "retarded," and questioning his mental stability. Saucier listened, took notes, and said she would look into it.

Kell went into Saucier's office after Lombardi came out. Kell testified he told Saucier that when he said he had a disability, McCollum responded that he did not have a disability, because he was taking medication. Kell told Saucier about Kulbacki's unwelcome comments about medication and Kell sounding "loopy." Kell also related to Saucier complaints about McCollum that Kell, as district manager, had received from store managers in his district. These managers testified they had, indeed, made these complaints to Kell. Kell told Saucier that store manager Bobbie Standridge complained that at the end of an onsite investigation of an employee complaint, McCollum sarcastically said that everybody in Standridge's store were "retards." Store manager Mario Zarate complained that McCollum commented that a particular employee was "retarded" and "white trash." Store manager Tasha Trease asked for a transfer to the Sacramento area, to which McCollum responded that a "little white girl" like Trease should not be working with "a bunch of [Blacks]." Trease had reported to Kell that McCollum actually used the " 'n' word," but Kell was uncomfortable repeating it to Saucier, who is African-American. Kell testified Saucier asked questions, took notes, and said she would investigate.

Saucier then went into Smith's office for about half an hour. Thereafter, because Lombardi was concerned about missing their flight, Saucier gave Kell and Lombardi a ride to the airport. Kell and Lombardi testified that Kell reiterated his concerns in the car. Kell brought up the "retard" comments and stressed that he wanted that to be addressed. Saucier coldly said they could not discuss the matter further. Saucier's demeanor had

6

changed. According to Kell, it was like talking to a wall. Her demeanor was "totally different" than when they spoke in her office. She had been "really engaged" earlier. According to Lombardi, Saucier was "very closed," "almost robotic" during the conversation on the way to the airport.

Concerned about Saucier's change in attitude, Lombardi later expressed his concerns to Kulbacki. Lombardi told Kulbacki that Kell "was speaking about things and [Kulbacki] needed to look into it." Lombardi further testified, "I pretty much reiterated to [Kulbacki] as much as I could without violating confidentiality confirmed what [Saucier] told me [*sic*]." Lombardi also told Kulbacki that Kell was "sounding like he was going to have a lawsuit coming." Kulbacki appeared "shocked and astonished" and "taken aback" at the mention of a lawsuit. Kulbacki told Lombardi he would look into it.

Nobody followed up with Lombardi regarding the complaints he made to Saucier. Likewise, Kell and the people who had complained to Kell about McCollum testified that there was no followup regarding their complaints.

At trial, Saucier, Smith, and Kulbacki all denied any knowledge and/or memory of any complaint of disability harassment or discrimination reported by Kell or Lombardi. Saucier also denied that Kell relayed any complaints from other managers about McCollum, and Smith denied being told about any such complaints.

Smith recalled that Kell wanted to talk to Saucier about his 360 evaluation, not about being treated unfairly. Smith said that after Saucier returned from the airport, she told him Kell had complained that Kulbacki was not "hands on," did not know the business, was disorganized and late for his own meetings. Based on what Saucier told him, Smith did not think Kell was complaining about being treated unfairly by Kulbacki. Smith said he talked to Kulbacki about "the complaints that were addressed with [him]," though he may not have mentioned Kell's name.

Saucier testified that she had no recollection about the 360 evaluation meeting Kell had with her on the first day of the conference. She did meet with Kell and

Lombardi on the last day of the conference, but claimed that neither of them said anything about disability harassment or discrimination against Kell. She recalled only that Kell expressed concerns that his supervisor, Kulbacki, was being hard on him, mean to him, and riding him about his performance. Saucier said she was unaware that Kell had a mental disability[4] and denied that Kell mentioned his mental health disability to her. Lombardi only reported that Kell had complaints about how Kulbacki was talking to and managing him.

Saucier testified that after meeting with Lombardi and Kell, she talked with Smith about what they had said. Thereafter, she took Kell and Lombardi to the airport, but she could not remember Kell complaining as they drove to the airport about McCollum using the word "retard." She said she could not remember any specifics about the conversation on the way to the airport, except discussion about her new baby.

Saucier testified she did not retain her notes of her office conversation with Kell or Lombardi because, "Our process is when we have a complaint that rises to the level of like a diversity, a diversity complaint or sexual harassment or the types of complaints that we're going to do an investigation on, we will go ahead and switch to our internal investigation form. So when we talk to employees, and we talk to a lot of employees if they have complaints, we take that information down and it doesn't rise to a level of an investigation or it doesn't violate their rights, we don't -- I haven't retained those because of the sheer volume of employee concerns that are brought forward that don't fall into that criteria. But when it is, we do a formal investigation."

For a formal investigation, the matter would be sent to the AutoZoner Relations Department and personnel there would be informed of the complaint, but no formal investigation was begun in this case. Saucier nevertheless testified she had a subsequent

---

[4] Saucier testified that medical files are not maintained with the personnel files.

phone conversation with Kell to let him know "we're looking into this, we're looking into your concerns, they've been heard and we have a process going with it." What Saucier said she did was to "informally investigate[]" by speaking with Kulbacki and giving him "some coaching," which is Saucier's word for "follow-up for the informal complaint." Saucier said she asked Kulbacki "questions about his management of [plaintiff], [plaintiff's] district performance, how he was coaching him, how he was speaking to him, how he was directing his performance, . . . how they're working with the regional team." She testified that she asked "how are you approaching it, what's your conversation with him. And then formal if you want to call it from a perspective it could involve some coaching where you could direct him about different ways to direct their employees."

Saucier also had a conversation with McCollum about Kell's complaint that Kulbacki was being mean and unfair. Saucier did not ask Kell or McCollum why Kell was bringing the matter to Saucier rather than to McCollum, which was the "recommended flow" within the AutoZone hierarchy. Saucier indicated AutoZone allows employees to submit complaints to other managers outside the "recommended flow."

Saucier testified that less than a month after Kell's complaint, she had a conversation with Kell, in which she informed him, "we have looked at your concerns, I have talked to [Kulbacki] about them. [¶] There are some things that are differences or disagreements or disputes between two people in a working relationship. We spoke to [Kell's] regional manager, gave him some coaching."

Kulbacki testified he did not recall Saucier telling him that Kell complained about him (Kulbacki) being mean and unfair. He also testified he did not recall whether he received any coaching from Saucier.

AutoZone's "Legal Module" in the district manager training manual provided at the training conference stated, "Emails are discoverable - Don't retain emails detailing

9

problems." It also stated, "Information in your daytimer/planner is discoverable. When logging information for yourself only list the facts - leave out your opinions." The manual directed that this "Legal Module" should be posted in all stores so store managers and supervisors would know what to do in problem situations. Smith testified that the outside counsel who made these advisements further explained that e-mails should be forwarded to AutoZoner Relations so they could all be retained in one place, and notes should be understandable and professional. Nothing in the written document describes this additional explanation regarding e-mails and notes.

After the training conference, Kell performed a loss prevention (LP) audit of store 2858 in Stockton around June 6 or 8, before his upcoming vacation June 19 to 25, 2005. Because the store had a history of cash or inventory losses ("high shrink"), monthly audits were required. Audits are based on documents from a "look-back period" of 14 days. Kell said the practice was to print out copies of the audit for the LP binder, store manager, etc., and then press F7 on the computer keyboard to enter the audit into the system.

On June 24, 2005, near the end of his Disneyland vacation with his family, Kell received a phone call from Regional LP Manager Kathryn White, saying Kell needed to complete the LP audit for store 2858. Kell told her it was already done. White said the audit did not show in the system, and he needed to "get to the store and get it done as soon as possible." Kell repeated that the audit was done. He also told her a copy was at the store. White had not said anything about the audit coming due during the weekly regional conference call on June 13, 2005, before Kell left for vacation, despite her practice of reminding district managers of outstanding audits. Kell testified that, had White brought it up at that time, he would have discovered that the computer had not captured the audit, and he could have simply provided her with his hard copy. But since more than 14 days had passed, the audit had to be redone. However, Kell also testified that, when White called him on vacation, he did not think of simply giving White a copy

of the audit he had already performed. Of the five or six audits Kell completed before he went on vacation, only the LP audit of store 2858 was missing. Kell testified that White could have done the audit herself. White testified that she had done audits for district managers many times if a district manager said he or she was too busy with other things.

When Kell returned from vacation on June 27, 2005, his workload was "pretty horrendous." Decisions had been put off while he was gone and there was an HR problem in one his stores. Because he had other pressing matters, he enlisted the help of store manager Zarate to do a new audit for store 2858. The audit was completed on June 28, 2005. There was conflicting evidence as to whether it was permissible for district managers to rely on store managers in conducting audits. Kell found a few errors in the store manager's self audit. Kell gave store 2858 a passing score of 93. However, in his deposition, Kell admitted he was in a rush and did not comply with audit procedures required by AutoZone's DIY (Do It Yourself) LP Audit Training Guide. He did not personally verify the portions of the audit done by Zarate. Kell admitted he knew that, by pressing F7 to enter the audit on the store's computer, he was representing to AutoZone that he, Kell, had verified the accuracy of the audit, when in fact he had not done so. He nevertheless did not consider what he had done to be document falsification.

White testified that on July 7, 2005, she visited store 2858 to conduct a "pre-blitz" LP audit before an LP blitz, in which combined regional LP teams go through stores in detail looking for loss prevention issues. White's audit yielded a score of 57 -- much lower than the 93 in Kell's audit. She said she did the audit to help the store, though it was not required. She did not keep the printout of her audit.

There was conflicting evidence as to whether White actually conducted an audit and the results. According to Kell, White never showed him her audit and did not provide him with an actual score from her audit. She asked him why his audit was different from hers, but she did not explain what the differences were. In response, he

11

told her, "Remember, you told me I needed to come into the store and do it really quick" and she said "[y]eah" and that it "wasn't really a big deal." Zarate also testified White did not tell him that his store received a failing audit score of 57. Neither Kell nor Zarate received from White an "audit fix-it list" to detail flaws and provide tips on improving performance, even though it was AutoZone policy to do so. White gave Kell only a blitz fix-it list.[5]

Kell never saw a fix-it list from a July 7 audit until after this litigation started. At her deposition, White produced an unsigned fix-it list consisting of two pages dated on the first page July 7, 2005. White admitted at the deposition that she had nothing other than her memory to prove she conveyed the information to Kell. At trial, White produced a three-page July 7, 2005 fix-it list bearing purported signatures of Kell and Zarate on the third page. She said she happened to find it after her deposition. She did not subsequently correct her deposition testimony. Her deposition notice had not required a production of documents, so she gave the fix-it list to AutoZone's counsel and did not provide it to Kell's counsel.

White testified that the newly discovered fix-it list is the original. The first two pages were identical to copies of the two pages White brought to the deposition. The third page, which bore only the signatures, was not dated and there was nothing on that page connecting it to the first two pages.

After her July 7 audit, White told Kulbacki that "there was a Q & A going on" and "it doesn't look good" for Kell.

---

[5] AutoZone says Kell admitted White gave him a short fix-it list on July 7, but the cited page of the transcript shows only that Kell testified White gave him a "blitz fix-it list" of "stuff that needed to be focused on before the blitz," but he testified she did not give him an *audit* fix-it list.

No one asked Kell about the audit discrepancy until over a month after White's visit, when she conducted a handwritten investigative "Q&A" of Kell on August 15, 2005. In the interim, Kell performed his normal duties, including performing audits, training others on audit procedures, and even participating in the LP blitz of other stores. AutoZone did not save any documents which would have validated White's audit and proved that Kell's audit was false.

White conducted the August 15 investigative Q&A with McCollum -- the person about whom Kell had complained to Saucier and with whom Saucier had conversed about Kulbacki -- present as a witness. McCollum's presence made Kell uncomfortable. As part of the Q&A, Kell handwrote answers to specific questions and signed the form. Kell wrote he was in a rush during the June 28 audit, having just returned from vacation. He "skimmed" the audit, and probably trusted Zarate, the store manager, too much. He wrote that this was the first time he had relied on a store manager's audit. Kell wrote "yes" in response to questions asking if he was treated fairly and gave his statement without threats or promises. In response to a question, "Is there anything you wish to add?" Kell wrote he "should have dug deeper" but this was the first time he had a discrepancy, and it had come to light at conference calls that a lot of district managers' audits did not match LP grades, and Kell hoped that all district managers were being treated the same.

White never interviewed Zarate. She testified Kell "was the one who was in question for failing to do his audit properly. It had nothing to do with [Zarate]."

The day after the Q&A, Kell met with his doctor and was put on medical leave.

While on leave, Kell phoned Saucier and left a voicemail message complaining that the Q&A had been in retaliation for his complaints. Kell testified that Saucier called him back and they spoke for 40 to 45 minutes. He again told her he believed the Q&A was in retaliation for his complaints. He also said he had medication issues during the session.

13

Saucier testified Kell attempted to make contact with her after the Q&A, but she had no recollection of speaking with him and denied that Kell ever called her with a retaliation complaint.

While on leave, Kell received an e-mail from Smith that should not have been directed to Kell, indicating Saucier had requested a self-demotion.[6] Kell took it as a message that he no longer had anyone to follow up on his complaints, and he should just shut up. Smith testified the e-mail was sent to Kell by mistake.[7]

On October 21, 2005, a second Q&A was conducted by AutoZone's divisional lead investigator, Octavio Jara, because plaintiff had complained of medication issues at the first Q&A. Kell testified he was told the second Q&A was needed for followup. Jara did not testify, but the second written Q&A was used in the decision to fire Kell. The form showed that, pursuant to company policy, Jara prohibited Kell from using the tape recorder he brought into the room. Kell handwrote on the second Q&A that he rushed his audit because he had just returned from vacation, was "behind on issues in the district," was told the audit had to be done, and had a doctor's appointment later in the same morning of the audit. Kell wrote he believed he was supposed to go back 14 days for the audit, but he "mistakenly" went back only two or three days. In response to the question whether he wanted to add anything, Kell wrote: (1) White found discrepancies in other district managers' audits and asked whether they underwent similar interviews, (2) in the past he had asked the regional staff for support but did not get it, and (3) his mental health condition had become very bad during this time frame and he had to take a leave

---

[6] Saucier and Smith testified that Saucier requested a demotion so she could spend more time with her new baby.

[7] Smith testified that he intended to send the e-mail to a payroll clerk named Traveka. He said he typed in the first two or three letters in AutoZone's e-mail system, and the system filled in the address.

of absence. When asked who denied him support, Kell gave the names of Kulbacki and McCollum and wrote that Kulbacki had recently acknowledged he should have given Kell support.

Kell testified he told Jara that somebody was out to retaliate against him for having filed a complaint with Saucier. When asked during his testimony why he did not mention retaliation in his written comment on the Q&A, Kell testified he did not think of putting it on there. He thought it important but did not think it important enough to put it on the written Q&A. He said the Q&A was over and his mentioning it was more of a general conversation he had with Jara. Jara told him to put it in writing, but Kell declined to do so and told Jara to talk to Saucier because she took notes when he made the complaint. Kell thought there was no need for him to rewrite the complaints after having already reported them to Saucier.

On November 4, 2005, AutoZone fired Kell. Kulbacki delivered the news to Kell in the parking lot outside one of the stores, with McCollum as a witness, after the three of them had spent hours together that day working. Kulbacki told Kell he was being fired for falsification of AutoZone documents and loss of confidence. Kell was not allowed to leave in his company car and had to accept a ride from Kulbacki. Kell was humiliated.

Kulbacki testified he took no part in the decision to fire Kell, though he was included in a telephone conference call with Smith and AutoZoner Relations to discuss Kell's termination. AutoZoner Relations is part of AutoZone's legal department. Kulbacki testified that the "termination was determined by the evidence that was turned over to AutoZoner Relations and reviewed by my boss, Rick Smith, the divisional VP." Kulbacki acknowledged he had a responsibility to prevent retaliation but said he had no authority to check the facts whether Kell's audit was false. According to Kulbacki, AutoZoner Relations' recommendation to terminate an employee is essentially a mandate. He was unsure whether Smith had the authority to override AutoZoner Relations.

Saucier testified she was not involved in the LP investigation of Kell. Nor was she involved in his termination. Her understanding of the process is that regional LP conducts investigations and sends the results to the "legal department," which makes a recommendation to the regional team. Rick Smith would have been part of the review of the investigation but would have received a recommendation for termination from the "legal department." Because this involved the termination of a district manager, Rick Smith and the divisional team would have been responsible for reviewing it or knowing what was going on with it, but the recommendation is made to the region where the investigation is conducted -- Kulbacki's team. According to Saucier, Smith would not have made the ultimate decision to terminate Kell.

Smith testified he is an officer and managing agent for AutoZone. He testified it was his job to make sure the decision to terminate Kell was fair. He said he reviewed the AutoZoner Relations' investigation and "could not come up with anything that would cause [him] to go against their recommendation," so he concurred with it. But Smith, who had 25 years with AutoZone, with the last 12 years as the divisional vice-president, also testified in terms of his being the one making the termination decision. He testified that "[a]s a best practice, [he] personally get[s] involved in all district manager terminations to make sure that the process is fair, to make sure there's oversight above the RM [regional manager], *so that*[] *it's never just an RM decision making a decision on a DM* [district manager]." (Italics added.) He testified about the AutoZoner Relations review for fairness and consistency, "before they *ever bring me* the recommendation." (Italics added.) When asked whether he understood that a person who is wrongfully terminated from his employment will experience lost income, Smith testified, "I have not been wrongfully terminated but I will tell you every decision that I ever make concerning an AutoZoner, I spend time agonizing over it. Because I know these people. I've grown up in this company. *I don't make the decisions lightly*. I don't sit there flippantly and *decide who stays and who goes*. I look at the facts and I do what I'm paid to do, and *I*

16

*make a decision* to the best of my ability." (Italics added.) When asked whether he had done anything other than reviewing Kell's statements and having a teleconference about it "*with regard to making the decision* as to" Kell, Smith testified, "Other than process the entire incident and the situation just like I would do or anybody would do to think through what the situation was, what the facts were, what the evidence was and then try to make *the best decision I can make*." (Italics added.) He added that he went over and thought about Kell's statements, "and *I made the decision* based on all the facts that I had." When asked whether he relied on Kell's annual evaluation, "*in making* [*his*] *decision* to terminate" Kell, he acknowledged that he did not. (Italics added.)

Smith testified Kell was fired for falsification of an AutoZone document, the June 28, 2005 audit. When asked whether Kell accidentally provided false information or intentionally falsified information, Smith said Kell "intentionally falsified information." Smith concluded the falsification was intentional because Smith read a document that said Kell admitted he did it intentionally. Smith testified, "he did it and he knew he did it and he knew he shouldn't have done it." Whether Kell had done an earlier audit was "not even a question in the situation in the case." There is a double verification to show an audit has been done. "The F7 approval captures it electronically and the hard copy printout backs up that." Without either, "the assumption would be that [an audit] wasn't done."

Smith never spoke to Kell, White, or Zarate about the audit. Smith did not read the June 28 audit. He did not save the documents from the "period box" used to complete the audit. Smith just read the investigative report and the two Q&A's. Smith testified there was no reason for him to talk to anybody, because Kell never called the audit into question. Kell admitted he skimmed the audit -- that he only looked back two days. Smith did hear that Kell complained after the first Q&A that he had been having problems with his medication. But Smith did not construe this as a challenge to fairness. And the second Q&A was consistent with the first Q&A.

17

## Jury Instructions

The defense asked for jury instruction on "business judgment" and at-will employment because, as defense counsel told the court, "a major defense, a theory of defense of AutoZone in this case is that look, whether our decision was right or wrong, fair, unfair, wise, unwise, it doesn't matter because this gentleman was an at-will employee. As long as it was not motivated by retaliatory minimis [*sic*], then it shouldn't be second guessed by the jury, and that's a major theory by the defense."

The trial court rejected the defense request, because the point was already covered in other instructions on the elements of retaliation as well as a BAJI instruction on mixed motives (BAJI No. 12.26)[8] that the court stated it would give the jury.

Defense counsel said, "but the danger here without the business judgment [instruction], if a jury disagrees with AutoZone's reason, suppose they think we were too harsh and there should have been a demotion instead of a termination, then there's a void left as to what they do. [¶] It could be very tempting for the jury at that juncture, to say, well, we disagree. We think this was unfair, so it must have been retaliation. But if you put the business judgment instruction in there, then it prevents that. So that's my point."

---

[8] Pursuant to BAJI No. 12.26, the trial court instructed: "If you find that AutoZone, Inc.'s action, which is the subject of Travis Kell's claims, was actually motivated by both discriminatory and non-discriminatory reasons, AutoZone, Inc. is not liable if it can establish by a preponderance of the evidence that its legitimate reason, standing alone, would have induced it to make the same decision.

"An employer may not, however, prevail in a mixed-motives case by offering a legitimate and sufficient reason for its decision if that reason did not motivate it at the time of the decision. Neither may an employer meet its burden by merely showing that at the time of the decision it was motivated only in part by a legitimate reason. The essential premise of this defense is that a legitimate reason was present, and standing alone, would have induced the employer to make the same decision."

18

Kell's attorney argued the mixed-motives instruction applied only if the employer admittedly considered the employee's protected status at the time of the decision, e.g., firing a woman because she is pregnant and showing up late to work. The instruction is inapplicable here, Kell's counsel argued, because, "[i]n this case nobody is saying that they were specifically considering the fact of Travis Kell's disability and weighing that versus what had happened and that was their mixed motive and so we require a mixed motive instruction." Kell also argued the mixed-motives instruction applied only to discrimination, and Kell had dismissed the discrimination claim.

The court ruled that it would give the BAJI instruction on mixed motives.

The court also instructed the jury with CACI former No. 2505:

"Travis Kell claims that AutoZone, Inc. retaliated against him for complaining to AutoZone, Inc. about unlawful harassment and retaliation. To establish this claim, Travis Kell must prove all of the following:

"1. That Travis Kell complained to AutoZone, Inc. about unlawful harassment and retaliation;

"2. That AutoZone, Inc. discharged Travis Kell;

"3. That Travis Kell's complaint to AutoZone, Inc. about unlawful harassment and retaliation was *a motivating reason*[9] for Autozone, Inc.'s decision to discharge Travis Kell;

"4. That Travis Kell was harmed; and

"5. That AutoZone, Inc.'s conduct was a substantial factor in causing Travis Kell's harm." (Italics added.)

---

**9** In light of *Harris*, *supra*, 56 Cal.4th at page 232, CACI No. 2505 has been revised to change "a motivating reason" to "a substantial motivating reason." (Judicial Council of Cal., Civ. Jury Instns. (2013 supp.) Directions for Use, p. 178.)

CACI former No. 2507 told the jury: "A 'motivating reason' is a reason that contributed to the decision to take certain action, even though other reasons also may have contributed to the decision."[10]

Regarding causation of harm, the court instructed with CACI No. 430 (Negligence Causation) that "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm. [¶] Conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct."

Regarding failure to prevent harassment or retaliation, the jury was instructed with CACI former No. 2527 that Kell had to prove he was subjected to harassment "because" he had a mental disability, or retaliation "because" he opposed AutoZone's unlawful practices, and AutoZone's "failure to take reasonable steps to prevent harassment or retaliation was a substantial factor in causing [him] harm."

The trial court instructed the jury with BAJI No. 12.26 on mixed motives. (See fn. 8, *ante.*)

### Jury Verdicts

The jury returned special verdicts finding:

Kell was *not* subjected to unwanted harassing conduct by AutoZone or Kulbacki due to Kell's mental disability.

However, the jury found that Kell engaged in activities protected by the laws against unlawful harassment and retaliation by a vote of 11 to one. AutoZone discharged

---

[10] In light of *Harris*, *supra*, 56 Cal.4th at page 232, CACI No. 2507 has been revised to read, "A 'substantial motivating factor' is a reason that actually contributed to the [*specify adverse employment action*]. It must be more than a remote or trivial reason. It does not have to be the only reason motivating the [*adverse employment action*]." (Brackets and italics in original.) (Judicial Council of Cal., Civ. Jury Instns. (2013 supp.) Sources and Authority for CACI No. 2507, p. 183.)

Kell. Kell's protected activity was "a motivating reason" forAutoZone's decision to discharge Kell from his employment. AutoZone's conduct was a substantial factor in causing harm to Kell. Polling of the jury revealed nine voted "yes" and three voted "no" on the latter two questions. The jury unanimously found that Kell's damages were $36,827 for past economic damages, and $100,000 for past mental suffering, with zero for future mental suffering.[11]

In addition to finding retaliation, the jury found by a vote of 10 to two that AutoZone failed to take reasonable steps to prevent the "harassment or retaliation." By a vote of nine to three, the jury found that Kell was subjected to "either harassing conduct because of his mental disability *or* retaliation because he engaged in activities protected by the law against unlawful harassment and retaliation." And by a vote of nine to three, this failure was a substantial factor in causing Kell's harm.[12] The jury unanimously found the same amount of damages for economic loss and mental suffering.

The jury also found, by clear and convincing evidence, an agent or employee of AutoZone engaged in the conduct with malice, oppression or fraud, and one or more officers, directors, or managing agents of AutoZone authorized or ratified this conduct. The vote on these questions was nine to three.

---

[11] Kell got a new job in retail sales management about four months after AutoZone fired him.

[12] In his respondent's brief on appeal, Kell says AutoZone does not challenge the verdict concerning prevention, but AutoZone's opening brief does argue the prevention claim is derivative of the retaliation claim and falls with it. We agree with AutoZone that the prevention claim is derivative. (*Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 289 ["there's no logic that says an employee who has not been discriminated against can sue an employer for not preventing discrimination that didn't happen, for not having a policy to prevent discrimination when no discrimination occurred"].)

21

For punitive damages, AutoZone submitted its annual report showing operating profits of over one billion dollars per year for 2006, 2007, and 2008, and net income of $641,606,000 for the 53 weeks ending August 30, 2008. The jury awarded Kell $1,231,848 in punitive damages.

The trial court entered judgment that Kell recover from AutoZone the total of $1,505,502.

## Postverdict Motions

AutoZone moved for JNOV or new trial, arguing inconsistent verdict in that the nine jurors who voted in favor of Kell on liability were not the same nine jurors who voted in favor of punitive damages,[13] insufficiency of evidence for punitive damages, and unconstitutionally excessive award of punitive damages. The trial court denied the motions, except to order an amendment to the judgment, which incorrectly counted compensatory damages twice. The court ordered amendment of the judgment to show the correct amount of $1,368,675, though no amended judgment appears in the record.

## DISCUSSION

## I. FEHA Retaliation

FEHA makes it unlawful for an employer to discharge an employee in retaliation for opposing unlawful harassment or discrimination in employment, even if the charge of harassment or discrimination is unfounded. (§ 12940, subd. (h);[14] *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1043.)

---

[13] Juror No. 9 voted "yes" on the retaliation questions, but "no" as to whether the amount of punitive damages represented his/her verdict. Juror No. 12 voted "no" on the retaliation questions, but "yes" when polled about the punitive damage award.

[14] Section 12940 states in pertinent part: "It is an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California: [¶] . . . [¶] (h) For any employer, labor organization, employment agency, or person to

"To establish a prima facie case of retaliation, the plaintiff must show (1) he or she engaged in a protected activity; (2) the employer subjected the employee to an adverse employment action; and (3) a causal link between the protected activity and the employer's action. [Citations.] Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action. [Citation.] If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation 'drops out of the picture,' and the burden shifts back to the employee to prove intentional retaliation. [Citation.]" (*Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441, 1453.)

When an employer proffers a facially sufficient lawful reason for the termination, the plaintiff must show the termination resulted from retaliatory animus. (*Reeves v. Safeway Stores, Inc*. (2004) 121 Cal.App.4th 95, 112 (*Reeves*).) The employee cannot simply show the employer's decision to fire him was wrong or mistaken, since the factual dispute is whether retaliatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the employee must demonstrate such *weaknesses*, *implausibilities*, *inconsistencies*, *incoherencies*, *or contradictions in the employer's proffered legitimate reasons* for its action that a reasonable fact finder could rationally find them unworthy of credence, hence infer the employer did not act for the asserted nondiscriminatory reasons. (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1005.)

Causation is generally a question of fact for the jury. (*Lucas v. County of Los Angeles* (1996) 47 Cal.App.4th 277, 289.) A causal link may be established by an inference derived from circumstantial evidence such as evidence demonstrating that the employer was aware of the protected activity, and the adverse action followed within a

discharge, expel, or otherwise discriminate against any person *because* the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part. . . ." (Italics added.)

23

relatively short time. (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 69.)

## II.  New Issue of Instructional Error

The parties' initial appellate briefs argue, among other matters, whether Kell met his burden to show that his termination resulted from retaliatory animus for complaining of mental disability harassment, rather than nonretaliatory reasoning related to the audit, i.e., whether retaliation was "a motivating reason" for AutoZone's decision to fire Kell, in accordance with then-extant case law and the jury instructions. We normally review a substantial evidence contention first, because if it has merit, our reversal of the judgment ends the case, whereas other contentions may call for a remand for retrial. (*McCoy v. Hearst Corp.* (1991) 227 Cal.App.3d 1657, 1661 [a reversal for insufficiency of the evidence is based on the fact that the plaintiff's evidence, as a matter of law, does not support the plaintiff's cause of action].) However, while this appeal was pending, the California Supreme Court articulated a heightened standard of causation, requiring the plaintiff in a FEHA discrimination case to prove that the illegal criterion was "a *substantial* motivating factor." (*Harris*, *supra*, 56 Cal.4th 203.) Therefore, we begin by considering the effect of this new standard on this case.

## A.  The *Harris* Decision

In *Harris*, our high court held that, in order for a plaintiff to recover damages for employment discrimination under FEHA, it is not enough for the plaintiff to prove the illegitimate criterion was " 'a motivating factor' " for the employer's decision. Rather, the plaintiff must produce evidence to show that the illegitimate criterion was a "*substantial* motivating factor" for the employer's decision.[15] (*Harris*, *supra*, 56 Cal.4th at p. 232.)

---

[15] We conclude *post* that *Harris* applies to retaliation claims under FEHA.

24

The plaintiff in *Harris* alleged that she was fired from her job as a city bus driver because she was pregnant -- a violation of FEHA's prohibition against sex discrimination.[16] (*Harris*, *supra*, 56 Cal.4th at p. 211.) The city asserted the plaintiff was fired for poor performance, but asked the trial court to give BAJI No. 12.26 (see fn. 8, *ante*), which would have told the jury that if it found a mix of discriminatory and legitimate motives, the city could avoid liability by proving that a legitimate motive alone would have led it to make the same decision to terminate the plaintiff. (*Harris*, *supra*, at pp. 211, 213.) The trial court refused to give BAJI No. 12.26. Instead, the trial court merely instructed the jury that the plaintiff had to prove her pregnancy was a motivating factor/reason for the termination -- something that moved the will and induced action even though other matters may have contributed to the taking of the action. (*Id*. at p. 213.) The jury found by a vote of nine to three that the pregnancy was a motivating reason for the city's decision to fire the plaintiff. (*Ibid*.) The Court of Appeal held the refusal to instruct on mixed motives was prejudicial error. (*Id*. at pp. 211, 214.) The Supreme Court granted review "to decide whether BAJI No. 12.26's mixed-motive instruction is correct." (*Harris*, *supra*, 56 Cal.4th at p. 214.)

The focus of the *Harris* court's analysis was the interpretation of the phrase "because of" in section 12940, subdivision (a). (See fn. 16, *ante*.) The court noted that the phrase means there must be a causal link between the employer's consideration of a protected characteristic and the action taken by the employer. (*Harris*, *supra*, 56 Cal.4th at p. 215.) The court noted that there are three plausible meanings of "because of," as set forth in section 12940, subdivision (a): (1) discrimination was a "but for" cause of the employment decision, (2) discrimination was a "substantial factor" in the decision, or (3) discrimination was simply a "motivating factor." (*Id*. at p. 217.)

---

[16] Section 12940, subdivision (a) provides in pertinent part that it is an "unlawful employment practice" to discharge a person from employment "because of . . . sex."

25

In rejecting the "but for" test, the *Harris* court reasoned, "The FEHA's express purpose of 'provid[ing] effective remedies that will . . . prevent and deter unlawful employment practices (§ 12920.5) suggests that section 12940(a)'s prohibition on discrimination is not limited to instances where the discrimination is a 'but for' cause of the employment decision. An adverse employment decision substantially corrupted by. . . improper discrimination may be indicative of a recurrent policy or practice. A company's practice of sex stereotyping or a supervisor's refusal to promote 'another woman' may not be determinative for a particular job applicant, but it may be determinative for a future applicant if left unsanctioned and allowed to persist as a lawful employment practice." (*Harris*, *supra*, 56 Cal.4th at p. 230.)

The *Harris* court addressed the legal consequences that flow from an employer's proof that it would have made the same decision in the absence of any discrimination. (*Harris*, *supra*, 56 Cal.4th at p. 224.) The court clarified that a "same decision" showing meant "proof that the employer, in the absence of any discrimination, would have made the same decision *at the time it made its actual decision*." (*Ibid*.) In light of FEHA's goal of prevention and deterrence, "a same-decision showing by an employer is not a complete defense to liability when the plaintiff has proven that discrimination on the basis of a protected characteristic was a substantial factor motivating the adverse employment action. . . . [M]ere discriminatory thoughts or stray remarks are not sufficient to establish liability under the FEHA. But it would tend to defeat the preventive and deterrent purposes of the FEHA to hold that a same-decision showing entirely absolves an employer of liability when its employment decision was substantially motivated by discrimination." (*Id*. at p. 225.) "[T]o say that discrimination was not the 'but for' cause of an employment decision is not to say that discrimination played an insignificant role or that it necessarily played a lesser role than other, nondiscriminatory factors." (*Id*. at p. 229.) The court said it did not suggest "that discrimination must be alone sufficient to bring about an employment decision in order to constitute a substantial

26

motivating factor. But it is important to recognize that discrimination can be serious, consequential, and even by itself determinative of an employment decision without also being a 'but for' cause." (*Ibid.*) "When discrimination has been shown to be a substantial factor motivating an employment action, a declaration of its illegality serves to prevent that discriminatory practice from becoming a 'but for' cause of some other employment action going forward." (*Id*. at p. 230.) The *Harris* court went on to say, "Requiring the plaintiff to show that discrimination was a *substantial* motivating factor, rather than simply *a* motivating factor, more effectively ensures that liability will not be imposed based on evidence of mere thoughts or passing statements unrelated to the disputed employment decision. At the same time, . . . proof that discrimination was a *substantial* factor in an employment decision triggers the deterrent purpose of the FEHA and thus exposes the employer to liability, even if other factors would have led the employer to make the same decision at the time." (*Harris*, *supra*, 56 Cal.4th at p. 232.)

The *Harris* court held, "In sum, we construe section 12940(a) as follows: When a plaintiff has shown by a preponderance of the evidence that discrimination was a substantial factor motivating his or her termination, the employer is entitled to demonstrate that legitimate, nondiscriminatory reasons would have led it to make the same decision at the time. If the employer proves by a preponderance of the evidence that it would have made the same decision for lawful reasons, then the plaintiff cannot be awarded damages, backpay, or an order of reinstatement. However, where appropriate, the plaintiff may be entitled to declaratory or injunctive relief. . . ." (*Harris*, *supra*, 56 Cal.4th at p. 241.) The court declined to say what evidence might be sufficient for "substantial motivating factor," because of "the wide range of scenarios in which mixed-motive cases might arise . . . ." (*Id*. at p. 232.) As for asserting the defense, the court said the city's answer to the complaint, in which it contended its decision was based on legitimate nondiscriminatory reasons, sufficed to put the plaintiff on notice that the city would defend on the basis that it did not unlawfully discriminate and had a legitimate

27

reason for firing her.  (*Harris*, *supra*, 56 Cal.4th at p. 240.)  The court also said an employer need not concede mixed motives in order to rely on a "same decision" defense.  (*Ibid*.)  "[T]here is no inconsistency when an employer argues that its motive for discharging an employee was legitimate, while also arguing, contingently, that if the trier of fact finds a mixture of lawful and unlawful motives, then its lawful motive alone would have led to the discharge."  (*Ibid*.)  A defendant may plead inconsistent defenses in an answer, and such defenses may not be considered admissions against interest.  (*Id.* at pp. 240-241.)

As for jury instructions, the court concluded, "In light of today's decision, a jury in a mixed-motive case alleging unlawful termination should be instructed that it must find the employer's action was substantially motivated by discrimination before the burden shifts to the employer to make a same-decision showing, and that a same-decision showing precludes an award of reinstatement, backpay, or damages."  (*Harris*, *supra*, 56 Cal.4th at p. 241.)  The court affirmed the Court of Appeal's judgment overturning the damages verdict and remanded for the trial court to determine, in the event of a retrial, whether the evidence warranted a mixed-motive instruction.  (*Id*. at pp. 241-242.)

## B.  The *Alamo* Decision

Following *Harris*, the Court of Appeal, Second Appellate District, filed *Alamo*, a FEHA discrimination case which reversed a judgment in favor of the plaintiff on the ground that the trial court's failure to instruct on *Harris*'s "substantial motivating factor" standard was prejudicial error.  The Court of Appeal initially had affirmed the judgment, but the California Supreme Court granted review and transferred the case back to the Court of Appeal to reconsider its opinion in light of *Harris*.  (*Alamo*, *supra*, 219 Cal.App.4th at pp. 469, 474.)

In *Alamo*, the plaintiff was fired the day she returned from maternity leave.  She alleged she was fired due to pregnancy discrimination and retaliation in violation of the

FEHA and common law wrongful discharge.[17]  (*Alamo, supra*, 219 Cal.App.4th at pp. 469-470, 471-472.)  The employer maintained it fired her for poor performance, insubordination, and misconduct in engaging in a verbal altercation with a coworker.  (*Id.* at pp. 472-473.)

The trial court instructed the jury, pursuant to then-extant CACI instructions, that the plaintiff had to prove her pregnancy or taking pregnancy leave was "a motivating reason" for her termination, and that "a motivating reason" was a reason that contributed to the decision even though other reasons also would have contributed.  (*Alamo*, *supra*, 219 Cal.App.4th at p. 474.)  Regarding failure to prevent discrimination or retaliation, the court instructed the jury that the plaintiff had to prove she was subjected to discrimination or retaliation "because" she took a pregnancy-related leave.  (*Ibid.*)  The trial court refused the employer's requests to modify the standard CACI instructions to require "a substantial motivating reason" and to define the term as not being met if the same decision would have been made in the absence of any discriminatory or retaliatory motive.  (*Id.* at p. 475.)  The trial court also rejected the employer's request to instruct the jury with the mixed-motive instruction, BAJI No. 12.26, though the record did not reveal the court's reasoning.  (*Ibid.*)

The jury returned a general verdict in favor of the plaintiff and awarded her $10,000 in compensatory damages, but the jury found she failed to prove malice, oppression, or fraud, to support punitive damages.  (*Alamo*, *supra*, 219 Cal.App.4th at p. 473.)

---

[17]  It is not clear from the recitation of the facts in *Alamo* what complaint the plaintiff made or what the plaintiff did to oppose unlawful employment practices so as to provide a basis for the retaliation claim.  (§ 12940, subd. (h) [unlawful for employer to discharge or discriminate against any person "because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part"].)

On appeal, the employer argued the trial court erred by (1) instructing the jury pursuant to CACI that the plaintiff merely had to prove her pregnancy was "a motivating reason," rather than the "but for" cause of her discharge; and (2) refusing to instruct with BAJI No. 12.26 that the employer could avoid liability under a mixed-motive defense by proving it would have made the same decision even in the absence of any discriminatory or retaliatory motive. (*Alamo*, *supra*, 219 Cal.App.4th at p. 474.)

As to the first point, the *Alamo* court concluded that, in light of *Harris*, the jury should have been instructed that the pregnancy was a *substantial* motivating reason for the termination. (*Alamo*, *supra*, 219 Cal.App.4th at pp. 478-479.) The court went on to say, however, that the trial court did not err in instructing the jury regarding failure to prevent discrimination or retaliation pursuant to CACI former No. 2527, that the plaintiff had to prove the employer discriminated or retaliated against her "because" she took a leave for pregnancy, childbirth or related medical conditions. (*Id*. at pp. 479-480.)

As for BAJI No. 12.26 on mixed motives, the *Alamo* court held that the trial court's refusal to give that instruction was not error. (*Alamo*, *supra*, 219 Cal.App.4th at pp. 480-481.) The employer's failure to plead a mixed-motive or same-decision defense in its answer forfeited the defense at trial. (*Ibid*.) The *Alamo* court recognized that "[w]here an employer fails to plead the mixed-motive defense in its answer to the plaintiff's complaint, the trial court is not precluded from instructing the jury on the defense provided that the employer's properly pleaded affirmative defenses placed the plaintiff on notice of its intent to defend on the basis that it had not discriminated against the plaintiff and had legitimate reasons for the adverse employment decision." (*Alamo*, *supra*, 219 Cal.App.4th at p. 482, citing *Harris*, *supra*, 56 Cal.4th at pp. 239-

30

240.)  But the employer's pleading did not put the plaintiff on notice of a mixed-motive defense.[18]  (*Alamo*, *supra*, 219 Cal.App.4th at p. 482.)

The *Alamo* court summarily concluded, without analysis, that the error in instructing the jury on "a motivating reason" rather "a substantial motivating reason" was prejudicial error "because the proper standard of causation in a FEHA discrimination or retaliation claim is not 'a motivating reason,' as stated in the instructions [given], but rather 'a substantial motivating reason' as set forth in *Harris*."  (*Alamo*, *supra*, 219 Cal.App.4th at p. 483.)  The *Alamo* court reversed the judgment and remanded for retrial using the *Harris* standard of causation, and excluding the mixed-motive defense. (*Ibid*.)

## C.  Application of the *Harris* Standard

Kell's supplemental brief argues AutoZone forfeited any challenge to the "motivating reason" instruction by failing to raise it as an appellate issue.  Kell is wrong.

Although the trial court in this case correctly instructed the jury on causation under the then-extant case law, *Harris*'s articulation of a heightened standard applies to this appeal, because Kell's judgment is not yet final. (*Waller v. Truck Ins. Exchange*, *Inc.* (1995) 11 Cal.4th 1, 23-25 ["Courts of Appeal routinely consider newly published case law that was not available until after entry of judgment in the trial court"; see *id.* at pp. 24-25].)  Judicial decisions apply retroactively to cases not yet final.  (*Id.* at pp. 24-25; *Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308, 1334-1335 [same].)  And we

---

[18] No such obstacle appears in the case before us.  AutoZone's answer to the complaint asserted as an affirmative defense that, even assuming disability was a factor in the employment decision, AutoZone would have made the same decision even if disability was not considered.  AutoZone's answer did not expressly assert the same defense on the retaliation claim.  Nevertheless, the trial court, at AutoZone's request and over Kell's objection, instructed the jury with BAJI No. 12.26.  (See fn. 8, *ante*.)  Kell's supplemental brief acknowledges, "There is no issue of waiver as to the 'mixed-motive' instruction . . . ."

cannot fault trial counsel or the court for failing to anticipate the new case law. (*In re Glady R.* (1970) 1 Cal.3d 855, 861; *Guardianship of Stephen G.* (1995) 40 Cal.App.4th 1418, 1422-1423.)

Though *Harris* and *Alamo* dealt with FEHA discrimination, and the instant case deals with retaliation, neither party argues retaliation should be treated differently in this context, and we see no reason to do so. Similar to the discrimination provision in subdivision (a) of section 12490, the FEHA retaliation provision prohibits discharging an employee "because" he or she has opposed any practices forbidden by FEHA. (§ 12940, subd. (h).) This language suggests the causation requirements should be the same. Moreover, to construe *Harris* as applicable only to discrimination and not retaliation for opposing discrimination would make it *harder* for a plaintiff to prove discrimination (as "a substantial motivating reason") than retaliation (as "a motivating reason"). No policy reason supports such a disparity.

Retaliation has been part of California's fair employment statutes since the 1959 enactment of Labor Code former section 1420[19] as part of the California Fair Employment Practice Act or FEPA (Stats. 1959, ch. 121, § 1, p. 2002), and remained in the statutes when they were moved to the Government Code as the California Fair Employment and Housing Act in 1980. (Stats. 1980, ch. 992, § 4, p. 3140 et seq. [originally enacted as subd. (e) of § 12940 in Stats. 1980, ch. 992, § 4, p. 3149, redesignated as subd. (f) of § 12940 in Stats. 1982, ch. 1193, § 2, p. 4259; see § 12940, subd. (a)(2), (4), p. 4258), and later redesignated as subd. (h) of § 12940 in Stats. 2000,

---

[19] Labor Code former section 1420, subdivision (d) made it unlawful "For any employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this act or because he has filed a complaint, testified or assisted in any proceeding under this part." (Stats. 1959, ch. 121, § 1, p. 2001.) The only material change in language is that the current statute, Government Code section 12940, subdivision (h), says "or person" after "employment agency."

ch. 1049, § 7.5, p. 7716].)  And *Harris* acknowledged FEHA's purpose is both to "prevent and deter unlawful employment practices" (*Harris*, *supra*, 56 Cal.4th at p. 223, quoting § 12920.5), which covers both discrimination and retaliation.

We observe that, after *Harris*, the United States Supreme Court held in June 2013 that plaintiffs suing for employment discrimination/retaliation under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) must meet a higher (not lesser) standard of causation for retaliation claims than for discrimination claims.  (*University of Texas Southwestern Medical Center v. Nassar* (2013) _ U.S. _ [186 L.Ed.2d 503] (*University of Texas*).)  For discrimination claims, the plaintiff must prove that the illegitimate criterion was "a motivating factor." (*University of Texas*, *supra*, _ U.S. at p. ... [186 L.Ed.2d at p. 516].)  For retaliation claims, the plaintiff must prove traditional "but for" causation.  (*University of Texas*, *supra*, _ U.S. at pp. _ , _ [186 L.Ed.2d at pp. 518, 523, 524-525].)  The reason is because Title VII, pursuant to a 1991 amendment, expressly states in the discrimination provision (42 U.S.C. § 2000e-2(m)) -- but not the retaliation provision (42 U.S.C. § 2000e-5(g)(2)(B) -- that a plaintiff must show race, color, etc. was "a motivating factor for any employment practice, even though other factors also motivated the practice," but if the employer then showed it would have taken the same action anyway, the plaintiff's remedies are limited to declaratory and injunctive relief.  (*University of Texas*, *supra*, _ U.S. at pp. __, _ [186 L.Ed.2d at pp. 516, 530].)

No such language appears in FEHA.  The *Harris* court, though it filed its opinion several months before the *University of Texas* case, said California does not follow the federal Title VII statute regarding the standard of proof.  (*Harris*, *supra*, 56 Cal.4th at pp. 222-223.)  We see no reason to adopt a stricter standard for retaliation than for discrimination.

We conclude *Harris*'s standard applies to retaliation cases.  Thus, the instruction in which the jury was told that Kell need only show his protected activity was a motivating reason was incorrect.

33

## D. Harmless Error

Our conclusion that error occurred does not compel reversal of the judgment.

California Constitution, article VI, section 13, states, "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."

Code of Civil Procedure section 475 states, "The court must, in every stage of an action, disregard any error, improper ruling, instruction, or defect, in the pleadings or proceedings which, in the opinion of said court, does not affect the substantial rights of the parties. No judgment, decision, or decree shall be reversed or affected by reason of any error, ruling, instruction, or defect, unless it shall appear from the record that such error, ruling, instruction, or defect was prejudicial, and also that by reason of such error, ruling, instruction, or defect, the said party complaining or appealing sustained and suffered substantial injury, and that a different result would have been probable if such error, ruling, instruction, or defect had not occurred or existed. There shall be no presumption that error is prejudicial, or that injury was done if error is shown."

"When deciding whether an instructional error was prejudicial, 'we must examine the evidence, the arguments, and other factors to determine whether it is *reasonably probable* that instructions allowing application of an erroneous theory *actually* misled the jury.' [Citation.] A 'reasonable probability' in this context 'does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*.' [Citation.]" (*Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 682 (*Kinsman*).)

Instructional error improperly shifting the burden of proof on causation in a products liability case was held harmless in *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 983-985 (*Rutherford*). The erroneous instruction shifted the burden to the defendant to prove its asbestos products were not the legal cause of the decedent's asbestos-related cancer and death. (*Id.* at p. 957.) A correct instruction would have

34

required the plaintiff to establish causation by showing that exposure to the defendant's defective asbestos-containing product, in reasonable medical probability, was a substantial factor in contributing to the risk of developing asbestos-related cancer. (*Id.* at pp. 957-958, 982-983.)

In *Rutherford*, our high court reiterated the harmless error analysis it had previously articulated. In considering whether such instructional error was prejudicial, courts should consider (1) the state of the evidence, (2) the effect of other jury instructions, (3) the effect of the attorneys' arguments to the jury, and (4) whether there is any indication that the jury was misled. (*Rutherford*, *supra*, 16 Cal.4th at p. 983.) In applying these four considerations, the *Rutherford* court reasoned:

1. The instruction in no way impaired the defendant's ability to put before the jurors its full case on substantial factor causation. (*Rutherford*, *supra*, 16 Cal.4th at p. 983.) The instruction would not, by its nature, result in exclusion of evidence, and both sides put on evidence, including expert testimony on causation. (*Id.* at p. 984.)

2. Other instructions minimized the importance of the burden of proof as to the substantial factor issue. The jury was told that each concurrent factor contributing to an injury is a legal cause regardless of the extent to which it contributes. Even if the plaintiffs had borne the burden of proving exposure was a substantial factor creating the risk of cancer, it was unlikely the jury would have accepted the defendant's argument that the degree of risk such exposure contributed was too small to be considered a legal cause of the illness. (*Rutherford*, *supra*, 16 Cal.4th at p. 984.)

3. Counsels' arguments to the jury suggested the burden-shifting instruction played little or no role at trial. The defense primarily argued that the plaintiffs failed to meet their burden of showing decedent was ever exposed to inhalable fibers from defendant's product. Both sides discussed what portion of the decedent's asbestos exposure was attributable to the defendant's product and whether such exposure was a substantial factor compared to all other sources of cancer risk. Neither attorney drew

35

the jury's attention to the improper instruction. The plaintiffs' counsel, in fact, expressly took on the burden the instruction shifted to the defense. (*Rutherford*, *supra*, 16 Cal.4th at p. 984.)

4. The record did not indicate the jury was misled. The verdict -- assigning only 1.2 percent of fault to the defendant (*Rutherford*, *supra*, 16 Cal.4th at pp. 962, 985) -- suggested the jury accepted much of the defense's *factual* theory, concluding that exposure to the product contributed a relatively small amount to the decedent's cancer risk but rejected the defense argument that such a small contribution should be considered insubstantial (*id*. at p. 985). It thus appeared the jury resolved most of the factual uncertainty in the defendant's favor despite the burden-shifting instruction. A different result seemed unlikely had the jury been correctly instructed. (*Ibid*.)

Applying the *Rutherford* analysis, we conclude that the instructional error in the instant case was harmless.

### 1.      The State of the Evidence

As in *Rutherford*, the erroneous instruction here did not impair AutoZone's ability to put on its full case. (*Rutherford*, *supra*, 16 Cal.4th at pp. 983-984.) The instruction "would not, by its nature, result in exclusion of relevant defense evidence." (*Ibid*.)

The "state of the evidence" consideration also examines the degree of conflict in the evidence on critical issues related to the instruction. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580-581 (*Soule*); *Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1069-1070 (*Pool*).) Thus, unlike our substantial evidence discussion *post*, where we do not reweigh the evidence, we do consider the degree of conflict in the evidence in determining whether instructional error had prejudicial effect.

In *Pool*, the plaintiff sued the city on various causes of actions related to his arrest by the city's police officers. (*Pool*, *supra*, 42 Cal.3d at p. 1058.) As to the plaintiff's false arrest cause of action, the trial court erroneously instructed the jury on the issue of probable cause. (*Id*. at p. 1069.) Our high court noted that the critical issue was whether

36

the police had reasonable cause to arrest the plaintiff for willfully resisting, delaying, or obstructing them in the discharge of their duties.  The police officers had such cause if they believed the plaintiff swung at them or otherwise resisted their efforts to move him, but the plaintiff denied resisting and testified he cooperated with the officers.  (*Id*. at pp. 1070-1071.)  The *Pool* court observed, "Were this the only evidence presented on the matter, a conflict would be present and a finding that the instructional error was prejudicial might be supportable."  (*Id*. at p. 1071.)  However, a neutral witness corroborated the plaintiff's version of the events.  (*Ibid*.)  Consequently, it was likely the jury resolved the conflict on the critical issue of probable cause in the plaintiff's favor and thus the state of the evidence did not support a finding of prejudice resulting from the erroneous instruction.  (*Ibid*.)

As in *Pool*, the conflict of evidence in this case was mainly a conflict of credibility.  And as we will discuss in detail in our substantial evidence discussion, there were independent witnesses who corroborated aspects of Kell's recitation of critical events from which one could infer retaliatory motivation and thus, the evidence was not limited to testimony by Kell versus testimony by AutoZone's personnel.  It is not likely that the jury would have found AutoZone's witnesses more credible had the jury been instructed that it could impose liability on AutoZone only if AutoZone was "substantially" motivated by Kell's protected activity.

AutoZone argues Kell's evidence of retaliatory animus was entitled to little or no weight because there was no direct or circumstantial evidence, only speculation.  AutoZone argues lack of evidence of retaliatory animus, combined with solid evidence of the legitimate business reason for Kell's termination, demonstrates AutoZone was prejudiced by jury instructions using the lesser standard of causation.  AutoZone argues there is no "genuine" dispute that the *only* reason for the termination was the faulty audit investigated by the LP department.  AutoZone also claims it is "undisputed" that the operational decision makers, Kulbacki and Smith, could not interfere with or second

37

guess LP's investigation, especially absent evidence that either was aware of any defects in the investigation. These arguments, however, depend on AutoZone's myopic view of the evidence and misguided insistence that the jury was required to believe the testimony of AutoZone's personnel. As we will discuss, the credibility of AutoZone's witnesses on these matters was suspect and there was substantial evidence supporting conclusions contrary to AutoZone's arguments.

### 2.    The Effect of other Jury Instructions

Regarding causation of harm, the trial court instructed the jury that AutoZone's conduct had to be "a substantial factor in causing . . . Kell's harm." Thus, the jury found that the nature of AutoZone's conduct was "substantial." Additionally, unlike in *Harris* and *Alamo*, the trial court here instructed the jury on "mixed motive" as an affirmative defense, pursuant to BAJI No.12.26. (See fn. 8, *ante*.) AutoZone asserts that an affirmative defense comes into play only after Kell met his burden to show that protected activity was a substantial motivating reason for the termination. Moreover, it appears AutoZone considered the mixed-motive instruction a counterbalance to any perception by the jury that firing Kell was too harsh a penalty for his defect in performance. Nevertheless, if the jury found that protected activity was a mere *minor* motivating reason, the mixed-motive instruction would have allowed the jury to relieve AutoZone of liability, because the legitimate reason for firing Kell, "standing alone," would have induced AutoZone to make the same decision. (BAJI No. 12.26, fn. 8, *ante*.)

Furthermore, in connection with punitive damages, the jury not only found by clear and convincing evidence that AutoZone acted with malice, oppression, or fraud, but also awarded more than Kell had requested in punitive damages. Both of these circumstances indicate the jury did not find that the retaliatory motive was insubstantial.

AutoZone maintains we cannot consider the punitive damages instruction because, had the jury been properly instructed on the elements of the cause of action, it never would have reached the punitive damages instruction. However, when deciding whether

38

the instructional error was prejudicial, our duty is to determine whether it is reasonably probable that the erroneous instruction *actually* misled the jury. (*Kinsman*, *supra*, 37 Cal.4th at p. 682.)

Our high court used a punitive damage instruction to conclude the jury was not misled by instructional error in *Vaughn v. Jonas* (1948) 31 Cal.2d 586, a civil lawsuit for battery where the trial court erroneously instructed on self-defense by telling the jury that the defendant was permitted to use only the amount of force reasonably necessary to repel the attack, rather than the amount of force that *appeared* reasonably necessary *to the defendant*. (*Id*. at pp. 599-600.) The Supreme Court concluded the instructional error was harmless. "[I]t does not seem reasonably possible that the jury [was] misled by the error in question to defendant's prejudice. From the verdict awarding punitive damages it appears that the jury necessarily found that the defendant acted maliciously. Exemplary damages, under the instructions given on that subject, could not have been awarded unless the jury found that the shooting was actuated by malice; if it was actuated by malice it was unjustified on any theory. [Citation.] We [the Supreme Court] do not find any persuasive basis for believing that the finding as to malice was influenced to any extent whatsoever by the erroneous statements of law. In view of the verdict, therefore, and our duty under . . . the state Constitution, we cannot hold that the error in question requires reversal of the judgment." (*Id*. at pp. 600-601.)

Here the jury's punitive damages finding demonstrates it did not consider defendant's retaliatory motive to be minor. To the contrary, the findings necessary for punitive damages indicate that the jury found the motivation was, indeed, substantial.

Viewing the totality of the instructions here, it does not seem reasonably likely that the jury was misled into imposing liability for an insubstantial unlawful motive.

### 3. The Attorneys' Argument to the Jury

In *Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441, a FEHA retaliation case, the appellate court concluded the trial court erred by failing to instruct the jury that

39

"adverse employment action" meant only those actions that substantially and materially affected the terms and conditions of employment. The instruction the trial court gave left room for the jury to conclude that a mere change in the conditions of employment was enough to constitute an adverse employment action. (*Akers*, *supra*, 95 Cal.App.4th at pp. 1458-1459.) Nevertheless, the *Akers* court held the error was harmless because the plaintiff's attorney told the jury in closing argument that it must find the employer materially adversely changed the terms or conditions of the employment. (*Id*. at pp. 1459-1460.)

In *Soule*, our Supreme Court affirmed a judgment in favor of a plaintiff in a products liability case, even though the trial court erred in instructing the jury on the ordinary consumer expectations test for determining design defect, because the plaintiff's theory of design defect involved matters not subject to ordinary consumer expectations. (*Soule*, *supra*, 8 Cal.4th at p. 570.) Nevertheless, the error was harmless because all the evidence and argument focused on expert evaluation of the design and -- *even though the plaintiff's counsel briefly reminded the jury that the instructions allowed it to find liability based on consumer expectations* -- the consumer expectations theory was never emphasized. (*Id*. at p. 571.)

Here, counsel's closing arguments did not cure the error by telling the jury it must find the protected activity was a "substantial" motivating reason for the discharge. To the contrary, Kell's attorney told the jury it was "enough" if protected activity was "a reason" for the discharge. However, counsel did so only *briefly*. And counsel for Kell did not present a theory that protected activity was an insubstantial motive for the termination; nor did AutoZone. AutoZone's theory was that there was no protected activity.

Kell's attorney focused his closing argument on refuting the defense position that Kell had not engaged in any protected activity and characterizing defense witnesses as liars. After 45 pages of transcript on these matters, Kell's lawyer spoke of motive, stating:

". . . A motivating reason. Okay, this goes back to what I told you at opening. Only two stories are possible here, Ladies and Gentlemen. Only two. Either the plaintiff's side or the defense side. *There's no middle ground here.* Either every one of those [plaintiff's] witnesses were lying or AutoZone is lying about the fact that these things happened and about the fact that they were reported.

"So here's how that flushes out. Well, they claim they never knew. It never happened. Well, of course they have to do that because then that would mean they didn't have a motivating reason. I never knew. It never happened, so I couldn't have had a motivating reason.

"That's why Rick Smith is out of sink [*sic*] because he told you all he was the decision maker. But you know he knew because he read the statements and he didn't do anything about it. You know he knew because Staci Saucier told him. . . . Even if you were inclined to believe that there was any legitimacy as to doing the auto [*sic*: audit] together being some kind of violation of policy, well, there are the reasons. Even another reason doesn't kill it. As long as protected activity was a reason, that's enough.

"But considering AutoZone and all the people that they've brought here and lied to you, it would also be reasonable for you to throw all that out and say, well, they're lying because the only reason was to protect the company from liability . . . ." (Italics added.)

Defense counsel's argument on the motivating reason was that the decision makers, Smith and Kulbacki, did not know of the protected activity and, therefore, could not have been motivated by it. Defense counsel told the jurors that, assuming they found protected activity, "the third question [motivating reason] is crucial. Was the protected activity of . . . Kell a motivating reason for AutoZone's decision to discharge him? [¶] "In other words, Ladies and Gentlemen, what you have here, you have protected activity. You have adverse employment action. There has -- [Kell] has to prove a causal link between those two.

41

"Okay, that is another way of maybe rephrasing this motivating reason. So we have to ask ourselves were the two decision makers, Kulbacki and Smith, were they even aware of this protected activity. They both testified that they were not. They both testified very clearly that they were not aware of . . . Kell complaining to Staci Saucier on June 2 about unlawful harassment or discrimination. Obviously if you're not aware of something it can't motivate you to retaliate.

"Now again it has to be a motivating reason, something that causes you to make that decision. No evidence of that in this case at all.

"Now, even if they were aware of this so-called protected activity, was there an intervening event that came along to break that causal link? Yes, 6-28-05 was the intervening event. Did Mr. Smith or Mr. Kulbacki somehow stage that whole thing to come up with an excuse to terminate . . . Kell?

"Not very plausible, is it?

"So the intervening event was the falsified audit of 6-28-05. That's the reason he was terminated."

AutoZone's counsel further argued:

"Okay, so we get to this question on the retaliation . . . verdict form, you know, a motivating reason. Has to be a motivating reason, something that moves the mind to make that decision. All right, I submit to you the answer to this question should be a resounding no.

"Now one more thing about the audit before we move on. Katherine White's audit. Even if, let's assume for a minute that Katherine White's audit was incorrect, incomplete, whatever. The decision makers relied on that audit. The decision makers relied on the Q and A's, and so in their good-faith business judgment they felt that there was this discrepancy between the two audits which was not explained other than by . . . Kell himself who said I didn't go back more than the two or three days. I know I'm supposed to go back fourteen days.

42

"So but [*sic*] even if you believe her audit is somehow, you know, incorrect, incomplete, whatever, what this all goes to, Ladies and Gentlemen, is something they call the business-judgment rule, and that is that if -- for an at-will employee if a termination decision is unwise, incorrect, if you would disagree with it, it doesn't matter as long as it's not illegal, as long as it's not motivated by unlawful motivation.

"Then you can't second guess the business judgment of the private sector of an at-will employer. Keep that in min[d]. Don't be tempted to go there. It has to be an unlawful motivation. If it's not unlawful, even if it's unwise, incorrect, unfair, whatever, it doesn't -- you don't answer yes to that question. All right. So extremely important point to keep in mind.

"Maybe I'll just illustrate that to you for a second here. . . . Let's say this circle represents the sort of world of at-will employment in the private sector. [¶] Now there's certain things you cannot do even if you're an at-will employer. You can't discriminate because of race, age. You can't retaliate for unlawful -- based on protected activity. You can't discriminate because of disability, so even if you're at-will, you cannot terminate somebody for these reasons. And there's more. There's national origin, sexual orientation, etc. But any other reason, all these other reasons out here, no matter how unwise, unjust, unfair, that's not unlawful. It may be stupid. It may be bad for moral[e] to terminate folks for those unwise, unfair, incorrect reasons, but it's not illegal. That's the point I'm trying to make.

"There's a huge difference here and especially when you get to that retaliation claim. There's a huge difference between garden variety, run-of-the-mill complaints about some supervisor's management style, personality clashes, etc. If it's not based on race, gender, age, disability, etc., then it is not a protected activity. Huge distinction here.

"Ms. Saucier's testimony was on June [2nd], . . . Kell complained, and maybe she did use the words mean and unfair, whatever the words were. But again, it's not unlawful to be mean. Not very good for a supervisor to be mean, but as long as that

43

meanness is not motivated by one of these unlawful reasons it doesn't constitute protected activity for purposes of that first element of that retaliation claim. Remember protected activity, adverse employment action, causal link."

In rebuttal argument, Kell's attorney ridiculed the defense theory that they might have been mean and unfair to Kell for a not-unlawful reason.

We conclude that, even though Kell's counsel briefly referred to "a" motivating reason being "enough," he did not urge a verdict on a theory of liability based on less than substantial motive. (*Soule*, *supra*, 8 Cal.4th at p. 571 [counsel briefly mentioned but did not emphasize incorrect theory].)

### 3.      Whether the Jury was Misled

The jury found protected activity by a vote of 11 to one, motivating reason by a vote of nine to three, and liability for punitive damages by a vote of nine to three. AutoZone argues the closeness of the verdict in this case indicates the jury was misled, quoting from *Whiteley v. Phillip Morris*, *Inc*. (2004) 117 Cal.App.4th 635 (*Whiteley*), in which the court said, "A close verdict is a key indication that the jury was misled by an instructional error." (*Id*. at p. 665.) However, neither *Whiteley* nor its cited authorities suggest a nine-to-three vote in itself suffices to conclude the jury was misled. Indeed, the *Whiteley* court concluded that the instructional error was prejudicial based on multiple factors.

In *Whiteley*, a cigarette smoker sued tobacco companies and won a verdict on some fraud and negligence claims. (*Whiteley*, *supra*, 117 Cal.App.4th at p. 641.) The appellate court held the trial court erred by failing to instruct the jury not to hold the defendant tobacco companies liable for fraud or negligence (or punitive damages) based on conduct during a 10-year-period covered by an immunity statute, unless injury was caused by additives adulterating the product. (*Id*. at p. 654.) The *Whiteley* court concluded the error was prejudicial, based on a number of factors, including: (1) there was significant evidence of wrongdoing during the immunity period, and based on the

44

failure to instruct on the immunity statute, defendants were unable to argue that they were shielded from liability for 40 percent of the time the plaintiff's husband smoked; (2) no other instructions lessened the prejudice by informing the jury that it could not base liability for fraud or negligence upon the defendants' conduct during the immunity period or that punitive damages could not be based upon the defendants' conduct during this period; (3) the plaintiff in closing arguments during the liability and punitive damages phases of trial forcefully argued a continuing course of blameworthy conduct by the defendants over the decades, including the immunity period; and (4) the verdicts in favor of the plaintiff were close, nine to three on fraud by intentional misrepresentation, and ten to two finding the defendants acted with oppression, fraud, and malice in connection with the false promise and negligent misrepresentation counts. (*Id.* at pp. 657-666.) Thus, prejudice was not found based on a close verdict alone.

The cases cited in *Whiteley* also noted other factors in concluding the instructional error was prejudicial. In *Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, the appellate court held that the trial court in a wrongful death case erred in giving the proximate cause instruction containing the "but for" test of cause in fact, rather than the legal cause instruction using the "substantial factor" test for cause in fact. (*Id.* at pp. 1044 & fn. 2, 1048-1054.) The jury concluded the defendants were negligent, but their negligence was not the cause of death. (*Id.* at p. 1044.) The Supreme Court held the instructional error was prejudicial because (1) the evidence indicated the defendants were at least partially responsible for the decedent being in a position in which his inability to swim resulted in death; (2) although the jury's verdict on causation was not close, it was illogical and inconsistent to conclude that the defendants were negligent yet not a cause in fact of the death; (3) defense counsel's argument to the jury contributed to the instruction's misleading effect because it was "replete" with references to the decedent's inability to swim and his decision nevertheless to go out on the lake; and (4) other instructions did not remedy the error. (*Id.* at pp. 1054-1056 [verdicts of nine to three and 11 to 1 finding

45

defendants negligent, and a verdict of 10 to 2 finding no causation, were inconsistent given the record and strongly suggest prejudice from failure to instruct on "substantial factor" causation].)

In *Pool*, also cited in *Whiteley*, the Supreme Court concluded the error was harmless because (1) although there was conflicting evidence as to whether the plaintiff resisted or obstructed the police, the only neutral witness supported the plaintiff's version; (2) the closing arguments to the jury minimized the effect of the error by implicitly informing the jury that acceptance of the city's version of the facts was necessary to a verdict in the city's favor; (3) the jury did not ask for further instructions; and (4) the 11-to-1 verdict was a clear victory for the plaintiff. (*Pool*, *supra*, 42 Cal.3d at pp. 1070-1072.)

In *LeMons v. Regents of University of California* (1978) 21 Cal.3d 869, also cited by the *Whiteley* court, the trial court, at the defendants' request in a medical malpractice case, erroneously instructed the jury on a patient's contributory negligence in failing to follow proper medical advice and an injured party's duty to mitigate damages. (*LeMons*, *supra*, at pp. 873-874.) The jury rendered a nine-to-three verdict in favor of the defendants. (*Id*. at p. 874.) The Supreme Court reversed. Since there was no evidence that the plaintiff's original injury resulted from any failure to follow medical instructions, the trial court erred in instructing on contributory negligence. (*Id*. at pp. 875, 878.) The error was prejudicial, given: (1) the sharply conflicting expert witness testimony on the critical issue of whether the doctor's conduct was within the community standard of medical practice; (2) the increased harm caused by defense counsel's argument to the jury, in which counsel argued that the plaintiff was responsible for her lack of significant recovery because she sought "incompetent medical assistance" after abandoning the operating doctor's treatment program; and (3) the general instruction on liability for negligence intended to be given when there is no issue of contributory negligence did not cure the error because, when two instructions are inconsistent, the more specific charge

46

controls. (*Id*. at pp. 873, 876.) In addition to these factors, the *LeMons* court reasoned that the fact that only the bare number of jurors required to reach a verdict agreed upon the verdict in favor of the defendants lent " ' "further" support to the probability that the erroneous instruction was the factor which tipped the scales in the defendants' favor.' " (*Id*. at p. 877.)

In *Sandoval v. Bank of America* (2002) 94 Cal.App.4th 1378, cited in *Whiteley*, the court reversed a judgment *not* for instructional error, but for trial court error in responding to a jury question about causation during deliberations. (*Sandoval*, *supra*, at pp. 1381, 1386-1387.) The plaintiffs in a wrongful death case sued a bank, alleging the bank's negligent failure to provide adequate security was a cause of their decedent's death. The court submitted to the jury a special verdict form proposed by the bank, which asked the jury to answer: "If the defendant had not been negligent in the management of the premises, *would* the criminal assault on [decedent] have been *prevented*[?]" (*Id*. at p. 1382 & fn. 2, italics added.) During deliberations, the jury asked if it was correct in assuming that the word "would" was an absolute and the word "prevent" meant to totally eliminate the assault, shooting, and death. The trial court simply answered "yes." (*Id*. at pp. 1382-1383.) The jury returned a verdict in favor of the bank, finding the bank was negligent in its management of the premises, but its failure to provide increased security did not "actually cause[]" the decedent's injuries. (*Id*. at p. 1387.) The appellate court reversed, because the record indicated the jurors were confused, and the trial court prejudicially erred by giving an answer to the jury's question that imposed on the plaintiff a standard impossible to meet. (*Id*. at pp. 1387-1388.)

Lastly, in *Nizam-Aldine v. City of Oakland* (1996) 47 Cal.App.4th 364, the court reversed a judgment holding a city liable for defamation for falsely accusing civil engineers of conducting inaccurate and fraudulent boundary surveys. Since the statements pertained to a matter of public interest, the trial court erred by instructing

47

the jury that the burden was on the city to prove its statements were true. (*Nizam-Aldine*, *supra*, at pp. 367, 379.) The court concluded the error was prejudicial based on a number of factors, including: (1) there was voluminous conflicting evidence on the question whether the surveys were valid, and substantial evidence would have supported a finding either way -- a conflict in the evidence the court characterized as the "strongest factor evincing prejudice" (*id*. at p. 380), (2) the plaintiffs' trial counsel "repeatedly emphasized" the erroneous instruction during closing argument, (3) the jury deliberated nearly seven full days, (4) individual defendants were found not liable, and (5) the verdict against the city was by a nine-to-three vote. (*Ibid*.)

Here, although the verdicts on the key questions were by votes of nine to three, no other factors suggest the jury was misled. The jury deliberated approximately[20] two days, which was not a particularly long time, given the fact there were multiple claims and 12 pages of special verdict questions. The jury requested additional copies of the verdict forms but asked no questions about the instructions.

We conclude the instructional error in this case did not prejudice defendant.

### E. Summary Regarding the *Harris* Substantial Motivation Standard

We conclude *Harris*'s heightened standard applies to this case; the absence of a jury instruction on the heightened standard constitutes instructional error; but the error was harmless in this case. We now turn to the arguments in the initial briefs.

---

[20] The court minutes state the jury began deliberations at 3:15 p.m. on January 13, 2010, but also state the court adjourned at 10:16 a.m. that day, while the jury deliberated. The length of the transcript that day suggests 3:15 p.m. was accurate. The jury deliberated all day on Thursday, January 14, 2010. On the next court day, Tuesday, January 19, the jurors resumed deliberations at 9:00 a.m., reported at 2:15 p.m. that they had reached a verdict, and at 3:00 p.m. the verdicts were read.

### III. Substantial Evidence of Causal Link

AutoZone contends there is insufficient evidence of a causal link between Kell's protected activity and his termination to support Kell's retaliation claim. Kell responds in part that AutoZone has forfeited this contention by failing to set forth evidence favorable to the judgment in its appellate briefing. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 (*Foreman & Clark*).) AutoZone does skate close to forfeiture by omitting evidence favorable to Kell, e.g., that AutoZone rushed Kell to do an audit upon his return from vacation even though Kell had already performed an audit before he left for vacation, and evidence undermining the legitimacy of White's July 7 audit. Despite these deficiencies, we address the matter on its merits, and conclude substantial evidence supports the judgment, even under the heightened standard of "a substantial motivating factor."

### A. Standard of Review

" 'When a jury's verdict is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether, on the entire record, there is any substantial evidence, contradicted or uncontradicted, which will support it, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the jury. It is of no consequence that the jury believing other evidence, or drawing different inferences, might have reached a contrary conclusion.' [Citation.]" (*People v. Castro* (2006) 138 Cal.App.4th 137, 140, italics omitted.)

"[A] judgment may be supported by inference, but the inference must be a reasonable conclusion from the evidence and cannot be based upon suspicion, imagination, speculation, surmise, conjecture or guesswork. [Citation.] Thus, an inference cannot stand if it is unreasonable when viewed in light of the whole record.

[Citation.]" (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1204 (*Beck*).)

"[T]he credibility of witnesses is generally a matter for the trier of fact to resolve. Accordingly, the testimony of a witness offered in support of a judgment may not be rejected on appeal unless it is physically impossible or inherently improbable and such inherent improbability plainly appears. [Citation.] Similarly, the testimony of a witness in derogation of the judgment may not be credited on appeal simply because it contradicts the plaintiff's evidence, regardless how 'overwhelming' it is claimed to be. [Citation.] Moreover, so long as the trier of fact does not act arbitrarily and has a rational ground for doing so, it may reject the testimony of a witness even though the witness is uncontradicted. [Citations.] Consequently, the testimony of a witness which has been rejected by the trier of fact cannot be credited on appeal unless, in view of the whole record, it is clear, positive, and of such a nature that it cannot rationally be disbelieved. [Citation.]" (*Beck*, *supra*, 44 Cal.App.4th at p. 1204.)

## B. Analysis

AutoZone argues it fired Kell solely for the nonretaliatory reason of his falsifying the June 28, 2005 audit. Kell argues the people who made the decision to fire Kell -- AutoZoner Relations -- were unaware of his protected activity, his June 2, 2005 complaint to Saucier. Although Smith participated in the decision to terminate Kell, AutoZone contends Smith had no choice, because he had no reason to dispute White's and Jara's investigations and could not interfere with or second guess the AutoZoner Relations people. Defendant focuses on the supposed "separation of powers," in that AutoZoner Relations, which handles the employee discipline investigations, is completely independent of operations (Smith and Kulbacki). AutoZone's arguments fail because they understate Smith's responsibilities and ignore evidence from which the jury could infer that Smith was aware of Kell's protected activity.

50

Certainly, an employer cannot be liable for retaliation if it was unaware of the plaintiff's protected activity. (*Reeves*, *supra*, 121 Cal.App.4th at p. 107.) The court in *Reeves* explained this concept is complicated with corporate employers. "This concept--which for convenience we will call the 'defense of ignorance'--poses few analytical challenges so long as the 'employer' is conceived as a single entity receiving and responding to stimuli as a unitary, indivisible organism. But this is often an inaccurate picture in a world where a majority of workers are employed by large economic enterprises with layered and compartmentalized management structures. In such enterprises, decisions significantly affecting personnel are rarely if ever the responsibility of a single actor. As a result, unexamined assertions about the knowledge, ignorance, or motives of 'the employer' may be fraught with ambiguities, untested assumptions, and begged questions." (*Reeves*, *supra*, 121 Cal.App.4th at p. 108.) In this pre-*Harris* case, the *Reeves* court reasoned, "The issue in each case is whether retaliatory animus was a but-for cause of the employer's adverse action. [Citations.] Logically, then, the plaintiff can establish the element of causation by showing that *any* of the persons involved in bringing about the adverse action held the requisite animus, provided that such person's animus operated as a 'but-for' cause, i.e., a force without which the adverse action would not have happened." (*Ibid*.)

We conclude there was sufficient evidence to establish that Smith was a decision maker and that retaliatory animus on his part was a substantial motivating factor when he participated in the decision to terminate Kell. Circumstantial evidence of retaliatory animus exists in defense witness denials, selective memory, inconsistencies, and the timing of Kell's termination.

As we have summarized, there was evidence that Kell complained to Saucier about discrimination and harassment and that Saucier spoke to Smith immediately after the report. While Saucier and Smith testified that the complaints registered by Kell and Lombardi related to aspects of Kulbacki's management style, both denied that Kell

51

relayed any harassment or discrimination complaints. But their testimony concerning the nature of Kell's complaints was inconsistent. Saucier testified that Kell complained Kulbacki had been mean and unfair to him and was riding him about his performance. Smith testified he thought Kell went to talk to Saucier about his 360 evaluation, not unfair treatment, and Saucier told him that Kell complained only about Kulbacki not knowing the business and various shortcomings of his management capabilities. Smith did not think, based on what Saucier told him, that Kell had complained about Kulbacki being mean and unfair to him. Saucier testified in detail that, as part of her informal investigation, she coached Kulbacki regarding Kell's complaints. But Kulbacki had no recollection of Saucier telling him Kell had complained that he had been mean and unfair or of being coached by Saucier.

Not only did Kell complain to Saucier about how McCollum and Kulbacki had treated him, but Kell also relayed to Saucier complaints made by three store managers about McCollum. All three store managers testified they had made those complaints to Kell. The jury could reasonably have found it unbelievable that three store managers made complaints to Kell about McCollum which somehow Kell did not relay to Saucier. Kell had no reason not to relay these complaints. Indeed, it was his job to do so.

The jury also could have reasonably found it unbelievable that Saucier would receive complaints about discrimination and harassment from Kell and talk to Smith about her conversation with Kell without mentioning the discrimination and harassment complaints. The jury obviously disbelieved Smith's testimony that no one told him that Kell complained about discrimination and harassment. On appeal, AutoZone does not try to perpetuate this disingenuous testimony. AutoZone's reply brief says, "For purposes of this appeal, AutoZone is not claiming that Kell failed to 'report' claims of unlawful conduct." AutoZone acknowledges that the jury presumably found that Smith and Kulbacki were aware of Kell's protected activities when Kell was terminated.

52

Further circumstantial evidence of Smith's retaliatory animus can be found in Saucier's change of attitude after speaking to Smith and Saucier's failure to recall any complaints being made on the way to the airport. The jury reasonably could have concluded that Saucier's change in attitude and failure to recall was a result of her conversation with Smith. Furthermore, the jury likely found it odd that Saucier took notes during her meeting with Kell and Kulbacki, and then discarded those notes without somehow documenting the conversations she had with them. Under the circumstances, the jury could reasonably have inferred that Saucier's destruction of her notes was consistent with the direction in the training manual legal module to not retain e-mails "detailing problems." Added to this was Saucier's denial that Kell complained the first Q&A was in retaliation for his complaint to her. Like Smith, the jury obviously did not believe Saucier.

Having concluded Smith's and Saucier's denials that Kell complained about harassment or discrimination were false denials, the jury reasonably could have inferred that the denials were part of an effort to cover up the true reason for Kell's termination. The jury could infer there would be no reason to deny that Kell made harassment or discrimination complaints if the reason for terminating him was the June 28 audit.

On appeal, AutoZone takes great pains to distance LP investigations and AutoZoner Relations from operations and give Smith a role other than decision maker.[21] In its reply brief, defendant argues, without citation to evidence in the record, that "[a]s a practical matter, . . . absent any awareness by Smith or Kulbacki that the loss prevention investigation was somehow defective, AutoZoner Relations' 'recommendation' of

---

[21] In contrast, as we have noted, in closing argument at trial, counsel for AutoZone characterized Smith and Kulbacki as decision makers, but contended they were unaware of Kell's protected activity. Counsel told the jury, "So we have to ask ourselves were *the two decision makers*, *Kulbacki and Smith*, were they even aware of this protected activity." (Italics added.)

53

termination was, in effect, the final decision. The concurrence of the operational managers was essentially a formality."

Yet, the jury reasonably could have found from the evidence that Smith was a decision maker and the effort to convert the AutoZoner Relations' *recommendation* to a *mandate* was yet another attempt to hide the truth.[22] While Smith testified that he had no ability or reason to question the AutoZoner Relations' recommendation, he testified that he does not take lightly his "decision" of "who stays and who goes" and made other statements indicating he had been the decision maker. And while Smith testified he merely "concurred" in the AutoZoner Relations' *recommendation*, he did not expressly state that his refusal to concur would have been overridden by AutoZoner Relations or that he had no authority to veto the AutoZoner Relations' recommendation for reasons other than flaws in the investigation.[23] No written company policy was introduced to establish this point either. Nor did anyone from AutoZoner Relations testify. Furthermore, the jury was not required to believe Smith's testimony that he concurred in the termination only because Kell "admitted" intentionally falsifying the audit. The jury could reasonably have found AutoZone's assertion of intentional fraud to be an

___

[22] Only Kulbacki referred to the AutoZoner Relations' recommendation as a "mandate." Neither Smith nor Saucier called the AutoZoner Relations' recommendations a mandate. Indeed, Saucier understood that the recommendation by AutoZoner Relations would have been made to Kulbacki's regional team. Furthermore, Kulbacki called his own credibility into question, for example by denying memory of being accused of sexual harassment and disability discrimination in prior lawsuits by other employees in which Kulbacki was deposed. The jury could conclude that there was no reasonable basis for him to forget such events and discounted his testimony in other particulars.

[23] At oral argument, counsel for AutoZone asserted that Smith testified he could not veto the AutoZoner Relations' recommendation unless there was a serious flaw in the investigation. No such testimony appears in the record. At no time did Smith state he lacked the authority to veto the AutoZoner Relations' recommendation absent flaws in the investigation.

exaggeration.  Indeed, White testified in her deposition that Kell never admitted intentional falsification.  He admitted "not conducting the audit the way AutoZone required."

Moreover, despite AutoZone's cries of fraud, AutoZone allowed Kell to keep doing audits and "integrity interviews" of potential management candidates after the June 28 audit.  Also, after White's July 7 audit, a month and a half went by before White interviewed Kell in the Q&A session.  Kulbacki admitted that White discovered what she perceived as falsification on July 7 causing her concern about Kell's integrity.  White said she concluded on July 7 that Kell's audit was falsified.  While Kulbacki testified that, until Kell signed a Q&A admitting wrongdoing, the audit was a mere discrepancy and that Kell would be treated as innocent until the investigation concluded, the jury was not required to believe that testimony.

We note that the company policy is that any discrimination or harassment complaint must be forwarded to AutoZoner Relations.  Smith testified that the failure to do so could result in discipline, including termination, and that this policy applies to him and people below and above him.  Based on the evidence, the jury reasonably could have concluded that after Kell and Lombardi complained to Saucier and Saucier reported to Smith, those complaints went no further than Smith's office -- a violation of AutoZone policy.  And given the close temporal proximity between Kell's protected activity, of which Smith was aware, and Kell's termination,[24] in which Smith participated as a decision maker, the jury could reasonably have concluded Smith retaliated by terminating Kell.

Even assuming for the sake of argument that the AutoZoner Relations staff who made the termination recommendation were ignorant of Kell's complaint to Saucier

---

[24]  We note the time lapse was protracted by White's delay of a month and a half in interviewing Kell about the audit.

and that Smith was required to rubber stamp the AutoZoner Relations' termination recommendation, there is still sufficient evidence to establish causation. We again look to *Reeves*. Though *Reeves* was a summary judgment case, the principles we take from *Reeves* have application in this jury trial case. As the *Reeves* court noted, there are a number of cases which suggest that "ignorance of a worker's protected activities or status does not afford a categorical defense unless it extends to *all* corporate actors *who contributed materially* to an adverse employment decision" (*Reeves*, *supra*, 121 Cal.App.4th at p. 109, second italics added) and "no case . . . holds that the ignorance of a 'decisionmaker' [*sic*] would still categorically shield the employer from liability if other substantial contributors to the decision bore the requisite animus" (*id*. at p. 110). The *Reeves* court gave an illustration: "A supervisor annoyed by a worker's complaints about sexual harassment might decide to get rid of that worker by, for instance, fabricating a case of misconduct, or *exaggerating* a minor instance of misconduct into one that will lead to dismissal. Another manager, accepting the fabricated case at face value, may decide, entirely without animus, to discharge the plaintiff. It would be absurd to say that the plaintiff in such a case could not prove a causal connection between discriminatory animus and his discharge. The situation is equivalent to one in which the supervisor simply fires the worker in retaliation for protected conduct. The supervisor's utilization of a complex management structure to achieve the same result cannot have the effect of insulating the employer from a liability that would otherwise be imposed." (*Reeves*, *supra*, 121 Cal.App.4th at pp. 108-109, italics added.)

In such a case, an innocent manager (here, AutoZoner Relations) could be a "cat's paw" doing the bidding of a manager who has retaliatory animus. As explained in *Reeves*, the term "cat's paw" apparently derives from a fable in which a cat and a monkey are watching some chestnuts roasting on hot chimney ashes, and, through flattery, the monkey persuades the cat that its paws are uniquely designed for pulling out the chestnuts. (*Reeves, supra*, 121 Cal.App.4th at p. 114, fn. 14.) The cat pulled out

the chestnuts, burning its paws. When the cat could pull out no more, he turned to see that the monkey had cracked and eaten the chestnuts. (*Ibid.*) The term has a second meaning -- a carpenter's tool used to extend the reach when pulling nails. (*Ibid.*) In the context of retaliatory discharge, the concept is broader: "Imputation of retaliatory animus will be justified by any set of facts that would permit a jury to find that an intermediary, for whatever reasons, simply carried out the will of the actuator, rather than breaking the chain of causation by taking a truly independent action." (*Id.* at pp. 114-115, fn. 14.)

Here, even if AutoZoner Relations' decision makers were ignorant of Kell's complaint to Saucier, and Smith could not reject the AutoZoner Relations' recommendation, the jury could reasonably conclude that Smith acted with retaliatory animus and exaggerated Kell's misconduct to justify his dismissal.

We also note, contrary to AutoZone's contention, there was evidence supporting an inference that White may have been aware of Kell's protected activity. Though AutoZone argues its loss prevention department is completely independent of its operations, the evidence suggests that the wall AutoZone says exists between loss prevention and operations is suspect. The evidence indicates that White maintained a close working relationship with operations and shared information regarding her investigation of Kell with Kulbacki. Circumstantial evidence that Kulbacki knew of Kell's protected activity can be found in evidence that Saucier spoke to him about Kell's complaints (complaints she claimed related to being mean and unfair) and Kulbacki's lapse of memory concerning any such conversation. Further, Lombardi twice told Kulbacki that Kell had concerns about which Kulbacki needed to talk to Kell. In the second conversation, Lombardi told Kulbacki it looked like Kell was going to file a lawsuit, news that "shocked and astonished" Kulbacki and caused him to appear "taken aback." After both conversations with Lombardi, Kulbacki told him he would look into Kell's concerns. It is reasonable to infer that Kulbacki did since he never talked to Kell about his concerns.

57

White testified she worked with Kulbacki and other regional staff. As regional LP manager, White participated in weekly meetings, sometimes in person, with Kulbacki, the regional manager, and other regional and district managers. Lombardi testified that multiple people in the regional office were talking about Kell's mental disability and had been advised by McCollum to monitor him. White testified she saw Kulbacki in the regional office shortly after her July 7 audit and gave him a "heads up" about her suspicion. Kulbacki testified that White told him there was a ""Q & A going" and said it did not look good for Kell. At Zarate's store, Zarate overheard Kublacki and White talking about Kell taking medication. The jury could reasonably have inferred that given these circumstances, the purported separation between loss prevention and operations and the "independence" of the investigation was suspect.

There was also evidence from which the jury could conclude that White was involved in the retaliatory action, even if she did not participate in the decision to terminate Kell. Even assuming an innocent explanation for the computer's failure to register plaintiff's June 8 audit, the jury could conclude from a series of oddities involving White that AutoZone manipulated circumstances to create a crisis and got lucky when Kell took shortcuts in his rush to redo the audit when he returned from vacation. White did not remind Kell of any outstanding audit in their June 13 conference call, as was her practice, and which would have allowed Kell to produce his hard copy within the 14-day look-back period or perform a new audit without being rushed. White did not do the audit while Kell was on vacation, even though, as she testified, she had done audits for district managers "many times" when they were too busy with other things. White did not go to the store to look for the hard copy of Kell's earlier audit. Nor did she keep a copy of the printout of the audit she purportedly did on July 7. Yet, that audit was relied upon in firing Kell, even though, as Smith testified, without the computer entry or hard copy, the assumption is that an audit has not been done. Further, there was conflicting evidence whether White gave Kell a fix-it list after her audit. White belatedly

58

produced a copy of the fix-it list with signatures, but the signatures represented the last page of the newly discovered document and there was nothing except White's word to connect that last page to the two pages of the fix-it list she had previously produced at her deposition. The jury could reasonably have been suspicious of White's late disclosure of the purported signature page which allegedly showed that Kell and Zarate received the fix-it list.

Even if Smith had no authority to veto the AutoZoner Relations' termination "recommendation" and was nothing more than a rubber stamp and White had no knowledge of Kell's protected activity, there was sufficient evidence to establish that White's investigation and AutoZoner Relations became the cat's paw for Smith's retaliation. (See *Reeves*, *supra*, 121 Cal.App.4th at pp. 113-116 [discussion of federal cases adopting or referring to the " 'cat's paw model' or a functional equivalent"].)

We conclude substantial evidence supports a causal link between Kell's protected activity and his termination.

## IV. Substantial Evidence of Oppression, Fraud, or Malice

AutoZone contends there is insufficient evidence of oppression, fraud, or malice to support punitive damages. We disagree.

Civil Code section 3294[25] authorizes an award of punitive damages if plaintiff proves by clear and convincing evidence that defendant is guilty of oppression, fraud, or malice. "The clear and convincing standard ' "requires a finding of high probability . . . ' "so clear as to leave no substantial doubt"; "sufficiently strong to command the

---

[25] Civil Code section 3294, subdivision (a) provides: "In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant."

unhesitating assent of every reasonable mind." ' " (*Scott v. Phoenix Schools, Inc*. (2009) 175 Cal.App.4th 702, 715 (*Scott*).)

Malice is "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (Civ. Code, § 3294, subd. (c)(1).) Oppression is "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." (Civ. Code, § 3294, subd. (c)(2).) Fraud is "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." (Civ. Code, § 3294, subd. (c)(3).)

AutoZone claims this case is similar to *Scott,* in which this court reversed a punitive damages award. AutoZone is wrong.

In *Scott*, a jury found that a preschool wrongfully fired its director, in violation of public policy, after the director told the parents of a prospective student that the school had no room for their child, based on state regulations setting minimum teacher-student ratios. (*Scott*, *supra*, 175 Cal.App.4th at p. 705.) This court affirmed the judgment but reversed the punitive damages award, reasoning that "[t]he only evidence of wrongful conduct directed toward Scott was her termination for an improper reason." (*Id*. at p. 716; see *id.* at p. 718.) The court distinguished another case, *Cloud v. Casey* (1999) 76 Cal.App.4th 895, 912, where an employer was liable for punitive damages because it denied the plaintiff a promotion based on gender, "then attempted to hide the illegal reason for denying the promotion with a false explanation, and that it was this fabrication that constituted the despicable conduct." (*Scott*, *supra*, 175 Cal.App.4th at p. 717.) This court said that, as to Ms. Scott, "There was no evidence [the school] attempted to hide the reason it terminated Scott. It admitted to terminating her because she would not enroll the . . . child. Likewise, there was no evidence [the school] engaged in a program of

60

unwarranted criticism to justify her termination." (*Scott*, *supra*, 175 Cal.App.4th at p. 717.)

Here, in contrast, there was ample evidence that retaliation was a motive in Kell's termination, as we have set forth *ante*, and that AutoZone attempted to hide that reason with false explanations and fabrications.

We conclude substantial evidence supports the jury's finding of oppression, fraud, or malice to support an award of punitive damages.

## V.  Claim of Excessive Punitive Damages Award

AutoZone argues the amount of the punitive damages award is unconstitutionally excessive, as the $1,231,848 punitive damages award is nine times the combined damages of $100,000 for mental suffering and $36,827 for economic damages. AutoZone contends that the constitutional limit in this case is a one-to-one ratio of punitive damages to compensatory damages. While we disagree with AutoZone's contention that a one-to-one ratio is the constitutional limit, we agree that the jury's nine-to-one award is excessive. We conclude that a five-to-one ratio is within constitutional limits here.

## A.  Constitutional Limits of Punitive Damages

Punitive damages may be imposed under state law to further a state's legitimate interests in punishing unlawful conduct and deterring its repetition. (*State Farm Mut. Ins. v. Campbell* (2003) 538 U.S. 408, 416 [155 L.Ed.2d 585] (*State Farm*).) However, the Due Process Clause "prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor. . . .  '[E]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose.' " (*State Farm*, *supra,* 538 U.S. at pp. 416-417.)

Our Supreme Court discussed *State Farm* in *Roby v. McKesson Corp*. (2009) 47 Cal.4th 686, 712-719 (*Roby*).  "In *State Farm*, the high court articulated 'three

61

guideposts' for courts reviewing punitive damages:  '(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.'  (*State Farm*, *supra*, 538 U.S. at p. 418; see also *BMW*[ *of North America, Inc. v. Gore* (1996)] 517 U.S. [559,] 575 [134 L.Ed.2d 809].)"  (*Roby*, *supra*, 47 Cal.4th at p. 712.)

In *Simon v. San Paolo U.S. Holding Co.*, *Inc.* (2005) 35 Cal.4th 1159 (*Simon*), a post-*State Farm* case discussed in *Roby*, our high court observed that an appellate court's reduction of a jury's punitive damages award " ' "is not an enviable task. . . .  In the last analysis, an appellate panel, convinced it must reduce an award of punitive damages, must rely on its combined experience and judgment." ' [Citation.]  The high court's due process analysis does not easily yield an exact figure:  we must attempt to arrive at such a number using imprecisely determined facts and 'applying guidelines that contain no absolutes.' [Citation.]  *An appellate court should keep in mind*, *as well*, *that its constitutional mission is only to find a level higher than which an award may not go*; *it is not to find the* '*right*' *level in the court's own view.*  While we must . . . assess independently the wrongfulness of a defendant's conduct, *our determination of a maximum award should allow some leeway for the possibility of reasonable differences in the weighing of culpability*.  In enforcing federal due process limits, an appellate court does not sit as a replacement for the jury but only as a check on arbitrary awards." (*Simon*, *supra*, 35 Cal.4th at p. 1188, some italics in original, italics added.)

### B.  Analysis

#### 1.    Degree of Reprehensibility

"Of the three guideposts outlined in *State Farm* . . . , the *most important* is the degree of reprehensibility of the defendant's conduct.  On this question, the high court instructed courts to consider whether '[1] the harm caused was physical as opposed to

economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident.' " (*Roby*, *supra*, 47 Cal.4th at p. 713, quoting *State Farm*, *supra*, 538 U.S. at p. 419, italics added.)  The court in *Roby*, a wrongful discharge case, reduced a compensatory damage award from $3.5 million to $1.4 million and reduced punitive damages from $15 million to $1.9 million, a ratio of one to one.  (*Roby*, *supra*, 47 Cal.4th at pp. 692-693, 719-720.)  The employer's wrongdoing with respect to discrimination was limited to its one-time decision to adopt a strict attendance policy that, in requiring 24-hour advance notice before an absence, did not reasonably accommodate employees who had disabilities or medical conditions that might require unexpected absences.  (*Id*. at p. 713.)

Here, AutoZone argues its conduct was not reprehensible because it simply followed its strict LP policies and "independent" LP investigation; there was no evidence it adopted its LP policies with a purpose to discriminate or retaliate; no one tricked Kell into performing the June 28 audit improperly; and AutoZone did not "repeatedly" retaliate.  AutoZone's position depends to a great extent on its theory of the case, which the jury rejected.  However, in determining whether a punitive damage award is excessive, we review the evidence under the substantial evidence standard of review in which appellate courts cannot reweigh the credibility of witnesses or resolve conflicts in the evidence.  Rather, we must view the conflicting evidence regarding punitive damages in the light most favorable to the judgment.  (*Bankhead v. ArvinMeritor, Inc*. (2012) 205 Cal.App.4th 68, 77 (*Bankhead*).)

### a.    The Harm Caused

Here, the harm caused was not purely economic.  Plaintiff suffered emotional harm.  In *Roby*, the court observed that, "the harm to [plaintiff] was 'physical' in the sense that it affected her emotional and mental health, rather than being a purely

economic harm." (*Roby*, *supra*, 47 Cal.4th at p. 713.)  Thus, because defendant caused emotional harm, the degree of reprehensibility is elevated here.

**b.      Indifference or Reckless Disregard for the Health or Safety of Others**

AutoZone's tortious conduct evinced an indifference to Kell's mental health.  In *Roby*, the court observed it was "objectively reasonable to assume that [the defendant's] acts of discrimination and harassment toward [the plaintiff] would affect her emotional well being, and therefore [the defendant's] 'conduct evinced an indifference to or a reckless disregard of the health or safety of others.' " (*Roby*, *supra*, 47 Cal.4th at p. 713.) Likewise, here it is objectively reasonable to assume retaliation by termination would affect Kell's emotional well being.  Indeed, AutoZone personnel knew Kell was suffering from mental health problems and was emotionally vulnerable.

Additionally, the evidence discloses that AutoZone did nothing about the complaints Kell received from store managers about McCollum after Kell relayed those complaints to Saucier.  The jury could have inferred from the evidence that those complaints were swept under Smith's office rug and that by doing so, AutoZone evinced an indifference or reckless disregard for the mental health of the employees that were the subject of McCollum's discriminatory comments.

The degree of reprehensibility is further elevated by this factor.

**c.      Isolated Event or Repeated Events**

Here, unlike in some other cases, we cannot say the conduct was repeated.  While the conduct went beyond Kell's termination in the sense that the complaints of other AutoZone personnel were ignored, AutoZone's conduct relative to Kell was an isolated event.  This factor makes AutoZone's conduct less reprehensible than cases involving repeated conduct.

**d.      Intentional Malice, Trickery, or Deceit or Mere Accident**

The conduct here was not accidental.  The termination was obviously intentional. Instead of taking corrective action involving inappropriate conduct by its managers,

64

the evidence supports a finding by the jury that AutoZone retaliated against Kell by terminating him for reporting that conduct. As we have noted in our substantial evidence analysis *ante*, the jury could reasonably have inferred that the deceit and lies regarding knowledge of Kell's protective activity evinced a cover-up.

This factor elevates the degree of reprehensibility here.

### e.      Summary of Reprehensibility Factors

Of the five *State Farm* reprehensibility factors, only one is not present here. Given the applicable *State Farm* factors and the facts underlying those considerations, we conclude that AutoZone scores in the medium-high range on the reprehensibility scale -- more reprehensible than in some cases, less than in others.

### 2.      Disparity between Actual Harm and Punitive Damages

"California published opinions on this issue have adopted a broad range of permissible ratios--from as low as one to one to as high as 16 to one—depending on the specific facts of each case." (*Bankhead*, *supra*, 205 Cal.App.4th at p. 88; accord, *Pfeifer v. John Crane, Inc.* (2013) 220 Cal.App.4th 1270, 1312-1313 (*Pfeifer*).)

Our high court has noted that, " '[D]ue process permits a higher ratio between punitive damages and a small compensatory award for purely economic damages containing no punitive element than [it does] between punitive damages and a substantial compensatory award for emotional distress; the latter may be based in part on indignation at the defendant's act and may be so large as to serve, itself, as a deterrent.' " (*Roby*, *supra*, 47 Cal.4th at p. 718, quoting *Simon*, *supra*, 35 Cal.4th at p. 1189.) Thus, a relevant consideration is whether the compensatory damages award includes a punitive element in the form of substantial mental suffering damages. (*Pfeifer*, *supra*, 220 Cal.App.4th at p. 1313.)

Here, the economic damages were small ($36,827), because Kell found another retail job within a few months of being fired by AutoZone. Despite the request in closing argument by Kell's counsel to award $1 million to $10 million for mental suffering, the

jury awarded plaintiff only $100,000. Thus, neither the circumstances nor the amount of mental suffering damages awarded suggest those damages reflect a punitive element or indignation by the jury. (See *Amerigraphics, Inc. v. Mercury Casualty Co.* (2010) 182 Cal.App.4th 1538, 1566 ["The $130,000 awarded by the jury in compensatory damages is the precise amount of damages that Amerigraphics sought. In light of the amount, there does not appear to be a punitive element to the compensatory damages award"]; see also *Bullock v. Phillip Morris USA, Inc.* (2011) 198 Cal.App.4th 543, 566-567 ["Unlike the situation where the plaintiff is awarded a generous amount for emotional distress arising from economic harm with no physical injury [citations], neither the circumstances . . . nor the amount of emotional distress damages suggests that those damages reflect . . . the jury's indignation at Philip Morris's conduct. [Fn. omitted.] We therefore have no reason to believe that the compensatory damages contain any significant punitive element."].)

In *State Farm*, the court suggested a one-to-one ratio might be the federal constitutional maximum in a case involving relatively low reprehensibility and a substantial award of noneconomic damages. (*State Farm*, *supra*, 538 U.S. at p. 425.) The court in *Roby*, in concluding a one-to-one ratio was the constitutional limit in that case, explained, "We note in particular the relatively low degree of reprehensibility on the part of [the defendant] and the substantial compensatory damages verdict, which included a substantial award of noneconomic damages. (*Roby*, *supra*, 47 Cal.4th at p. 719.) In contrast, here we have a relatively low compensatory damage award, with no punitive element to the award for mental suffering, and a medium-high level of reprehensibility. Thus, contrary to defendant's argument, the constitutional ceiling here is not a one-to-one ratio.

### 3. Civil Penalties

The third guidepost is the difference between the punitive damages and any civil penalties authorized or imposed in comparable cases. (*Roby*, *supra*, 47 Cal.4th at p. 718.)

FEHA violations subject employers to an administrative fine of up to $150,000. (*Id*. at pp. 718-719.)

In oral argument, counsel for defendant conceded that this factor is perhaps the least important of the *State Farm* factors, but asserted it is a factor that militates in favor of reducing the punitive damages here. We note that " '[t]he rationale for this consideration is that, if the penalties for comparable misconduct are much less than a punitive damages award, the tortfeasor lack[s] fair notice that the wrongful conduct could entail a sizable punitive damages award.' [Citation]" (*Grassilli v. Barr* (2006) 142 Cal.App.4th 1260, 1290.)

This guidepost weighs in favor of a lower constitutional limit in this case. However, we note that despite the limited civil penalties available, the *Roby* court nevertheless concluded that punitive damages of $1,905,000 was the constitutional ceiling in that FEHA wrongful termination case, notwithstanding that it found a "relatively low degree of reprehensibility." (*Roby*, *supra*, 47 Cal.4th at p. 719)

### 4. Reduction of Punitive Damages

In applying the *State Farm* factors, we consider that even Kell's attorney did not think this case warranted a multiplier of nine. Kell's attorney argued to the jury that an appropriate award would be a multiplier of seven or eight times the compensatory damages.[26] The jury nevertheless awarded nine times the compensatory damages. Kell's counsel argued to the jury: "The law makes it very clear, nine times, nine times is what we do for the worst, most reprehensible conduct that there could be in a case. That's the

---

[26] At oral argument, counsel for Kell, who was also Kell's trial attorney, indicated that he made this argument because he "presumed" that the jury would return the noneconomic damages award he had requested. We do not understand how that could be the case, since the jury returned its verdicts awarding the compensatory damages before the punitive damages phase of the trial and closing arguments on the issue of punitive damages.

maximum. So 136,000 x 9 is the highest you all could go even if you wand [*sic*] to punish them beyond that. It is not constitutional to go beyond that." Kell's counsel told the jury, ". . . I am going to give you a recommendation. This is not the nine. This isn't the worst it could ever be, although it is hard to imagine it being more pervasive than it is in this case. But this is about a seven to eight, that's where we're at in terms of sweeping some ugly, ugly conduct under the rug. This is a seven to an eight." Despite counsel's argument to the jury, Kell on appeal says the jury got it right.

" ' "In the last analysis, an appellate panel, convinced it must reduce an award of punitive damages, must rely on its combined experience and judgment." ' [Citation.]" (*Simon*, *supra*, 35 Cal.4th at p. 1188.) We conclude that the jury's award of punitive damages was constitutionally excessive. We agree with the assertion of Kell's counsel. A nine-to-one ratio exceeds constitutional limits here. But we also conclude that a ratio of seven to one also exceeds constitutional due process limits.

Keeping in mind that our "constitutional mission is only to find a level higher than which an award may not go" and not "the 'right' level" in [our] own view (*Simon*, *supra*, 35 Cal.4th at p. 1188), and further, "allow[ing] 'some leeway for the possibility of reasonable differences in the weighing of culpability' " (*Simon*, *supra*, 35 Cal.4th at p. 1188), we conclude that a multiplier of five is within constitutional limits, making the punitive damages award $684,135. "This amount, we believe, will 'further [California's] legitimate interests in punishing unlawful conduct and deterring its repetition.' " (*Simon*, *supra*, 35 Cal.4th at pp. 1188-1189.)

We have authority to order an absolute reduction of the award, rather than a conditional reduction with the alternative of a new trial on the amount of punitive damages. (*Simon*, *supra*, 35 Cal.4th at pp. 1187-1188.) We exercise that authority and order that the punitive damage award here be reduced to $684,135.

## DISPOSITION

The judgment is modified to reduce the award of punitive damages award to $684,135.  The trial court shall issue an amended judgment showing the correct amounts for compensatory and punitive damages.  As modified, the judgment is affirmed.  Kell shall recover costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(3), (5).)


           MURRAY      , J.


We concur:


     NICHOLSON    , Acting P. J.


       BUTZ          , J.